**In re William SPATZ, Debtor.**

**Louis W. LEVIT, Trustee of the Estate of William Spatz, Debtor, Plaintiff.**

v.

**William SPATZ, Wendy Spatz, David Spatz, et al., Defendants.**

**Bankruptcy No. 91 B 12774.
Adversary No. 93 A 00914.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

June 19, 1997.

Louis W. Levit and Brian L. Shaw, Ross & Hardies, Chicago, IL, for Movant.

David N. Missner and Janice Duban, Rudnick & Wolfe, for Respondent.

### *MEMORANDUM OPINION*

RONALD BARLIANT, Bankruptcy Judge.

The trial of this adversary proceeding has been limited to the first three counts of a multicount complaint. In those first three counts, the Trustee seeks to recover the value of property transferred by the Debtor, William Spatz, to his wife, Wendy Spatz (Counts I and II) and to his father, David Spatz (Count III).[1] The Trustee asserts that the transfers are avoidable under both the Illinois Uniform Fraudulent Transfer Act ("UFTA") and § 548 of the Bankruptcy Code and as a preferential transfer under § 547.[2] The Defendants contend that they paid full consideration for the transfers and, therefore, the transfers are not avoidable under the constructive or actual fraud provisions of either statute, regardless of the Debtor's intent. The Trustee disagrees, but this Court ordered that the issues of the value of the properties transferred and the value of consideration paid be tried first.[3]

---

1. Because the Debtor and the other Defendants all have the same last name, this Court will refer to David and Wendy by their first names.

2. Statutory references are to the Bankruptcy Code, 11 U.S.C. § 1 et.seq., unless otherwise indicated.

3. Scheduling the trial in this manner is permitted by Fed.R.Civ.P. 16(c)(14) (applicable to bankruptcy proceedings by Fed. R. Bankr.P. 7016) which provides that the court may take appropriate action with respect to "an order directing a party or parties to present evidence early in the trial with respect to a manageable issue that could, on the evidence, be the bases for ... a judgment on partial findings under Rule 52(c)."

This Court did not (before this opinion) definitively hold that payment of full value would be an absolute defense, but ordered the trial of the valuation issues before the trial of the intent, insolvency and other issues because in all events this Court would have to value the property transferred. It is undisputed that the Defendants have the burden of proving that they paid full consideration for the property transferred by the Debtor. It is also clear, that where transfers to family members are involved, a closer scrutiny is applied and the Defendants must establish that they paid full consideration by "clear and satisfactory proof." *See Falcon v. Thomas*, 258 Ill. App.3d 900, 910, 196 Ill.Dec. 244, 251, 629 N.E.2d 789, 796 (4th Dist.1994), *citing, Cairo Lumber*, 313 Ill.App. at 7, 39 N.E.2d at 599.

After both sides presented their evidence on value, the Defendants moved for judgment in their favor on the ground that they had paid full consideration and that there could therefore be no claim for fraudulent transfer.

■ For the reasons set forth below, this Court finds that, with one exception, the evidence established that the consideration paid by the Defendants exceeded the value of the property transferred by the Debtor. This Court further holds that the payment of full consideration is a defense to a fraudulent transfer action, whether the claim is based upon fraud in law or fraud in fact under either UFTA or § 548 of the Bankruptcy Code. Moreover, the Court finds that all the transfers were made more than one year before the filing of the bankruptcy case and therefore are beyond the reach of § 548 and the preference provisions of UFTA and the Bankruptcy Code.

The one exception is that Wendy received an asset this Court values at $50,000 without paying any consideration. Although the Trustee did not allege that particular transfer in his complaint, the issue was fully tried. Judgment will therefore be entered in favor of the Trustee and against Wendy for $50,000. Otherwise, judgment will be entered in favor of the Defendants.

### FINDINGS OF FACT [4]
### BACKGROUND

The Debtor, William Spatz, was in the real estate development and management business, mostly involving small shopping centers. He conducted these real estate activities through various entities, including numerous limited partnerships formed for individual developments and several corporations. A significant amount of the business was centralized in and conducted through Spatz & Co., a/k/a, Sitco, a corporation owned by the Debtor. Spatz & Co. (more fully described later) was a conduit for funds between the Spatz family and the individual projects.

An involuntary bankruptcy petition was filed against William Spatz on June 14, 1991. Spatz & Co. filed bankruptcy in March, 1993

in Colorado. By an order entered Nov. 2, 1993, this Court found that Spatz & Co. was the alter ego of Spatz and substantively consolidated the cases.

### DEBTOR'S CREDIBILITY

The Trustee spent much valuable time attacking the credibility of the Debtor, not without some effect. It is clear that the Debtor has shown tendencies to treat facts in a way that makes this Court uncomfortable. He valued assets on financial statements at amounts he knew were unrealistic, but justified it on the ground that both the method and the underlying facts and assumptions were disclosed, so anyone who cared could figure it all out. He evaded answering questions at a deposition about entities until the questioner used the exact name, down to the words "limited partnership." He transferred an interest in one entity to his wife the day after the partnership was formed, admittedly so that lenders would not know his wife was the owner if they just looked at the partnership documents, testifying later that the bank did not care.

On the other hand, the Debtor argues that he has been examined under oath an incredible seventeen times since his troubles began, and has never been shown to have fabricated any material evidence. When asked the right questions, he seems to give reliable answers. Most important, on the critical issues in this proceeding, the Debtor is supported by persuasive documentary evidence and reliable testimony by others. Indeed, in view of the credibility evidence presented by the Trustee, this Court has attempted to be sure there was such other evidence before crediting the Debtor's testimony on any point subject to serious controversy.

### COUNT I
#### Summary of Transaction

The Sale and Exchange Agreement dated January 10, 1989 ("Exchange Agreement") transferred all of the Debtor's interest in Spatz & Co., to Wendy. The Exchange Agreement also required the Debtor to transfer all of his interest in their Glencoe residence, a 28.375% limited partnership in-

---

4. To the extent these findings of fact contain a conclusion of law, it will stand as an additional conclusion of law; if any conclusions of law contain a finding of fact, it will stand as an additional finding of fact.

terest in Highland Park I and a 25.375% limited partnership interest in Highland Park II ("HP I" and "HPII") to Wendy. The Trustee alleges that this agreement was not executed until late 1989 or early 1990, but was back dated to January 1989. The Trustee also alleges that the value of Spatz & Co. as of January 1990 was between $745,000 and $802,000. The Trustee has previously settled any claim with respect to the residence for a payment of $125,000, and he makes no claim with respect to HP II. Therefore, the only property at issue is Spatz & Co.

The transfers of property to Wendy were only part of the transaction. According to the Debtor, it was a three way transaction, involving his father, David, as well as Wendy. As consideration for those transfers (Spatz & Co., HP I and II, and the house), Wendy agreed to assume the obligations of loans from David to Spatz & Co., and guaranteed by the Debtor. (Those loans are documented by certain Collateral Assignment of Stock and Partnership Interests, with annual amendments, "CASP" and are more fully described below.) Wendy agreed to assume the CASP obligations only to the extent they could be satisfied out of HP I and HPII. Wendy then pledged her interests in HP I and II to David as new security and David released Bill (the guarantor) and Spatz & Co., (the maker) from all of the CASP obligations and also released all of the collateral previously pledged to David to secure the CASP obligations.

### Factual Issues

At the close of this phase of the trial, the Defendants conceded that they had not proven the value of the consideration received by Debtor. Therefore, unless they established that the value of Spatz & Co., at the time of transfer was zero, they are not entitled to judgment on their full consideration argument. Accordingly, this Court will address only the value issue.

---

5. Mary Warmus, the Trustee's expert, valued Spatz & Co. as of January, 1990. Initially, this Court assumed that had been intentional, since the Trustee alleges that the transfer did not take place until January, 1990. At the commencement of Ms. Warmus' testimony, however, the Trustee attempted to introduce a revised valua-

### A. Value of Spatz & Co.

#### 1. Date of Transfer

The Exchange Agreement is dated January 10, 1989. The Trustee contends, however, that the Exchange Agreement was back dated and the transfer was actually made in 1990. The date matters because it is the date as of which Spatz & Co., must be valued, and the Trustee was unable to introduce any expert evidence of the value as of January, 1989.[5]

Eugene Faigus, who was the general counsel of Spatz & Co., testified that he drafted the Exchange Agreement just before he left the company in August, 1990. He testified that he started drafting the agreement in the Spring of 1990, that the draft went through several modifications and he completed it shortly before he left. He said he never saw it executed. Mr. Faigus also testified that he prepared the Fourth Amendment to the CASP in 1990 because the Exchange Agreement had not been executed. On the other hand, when asked these same questions several years ago at a deposition, Mr. Faigus said that he prepared the Exchange Agreement at the end of 1989 or beginning of 1990. When asked why he changed his testimony, he said that his memory is better now because of the "general nature of all of the documents."

This Court found Mr. Faigus' testimony regarding the dates he drafted various agreements suspect and unreliable. First, he did not adequately explain his prior inconsistent deposition testimony. Second, he gave similar testimony about another agreement (involved in Count III, and discussed below) that was materially rebutted by the Defendants. That undermines the credibility of this testimony about the Exchange Agreement. Third, Wendy began receiving distributions in May, 1990, but Faigus says the Exchange Agreement was not signed when he left in August. Fourth, another employee of Spatz & Co., testified that Mr. Faigus was preoccupied with other matters during the

tion of Spatz & Co., as of January, 1989. Ms. Warmus stated on direct examination that she had made a mistake by valuing Spatz & Co. as of January, 1990, rather than January, 1989. This Court denied the request to amend her report because the revised valuation was not offered until trial.

period he now claims to have worked on the agreement, and spent little time on Spatz & Co., business. Finally, although he testified that he bears no grudge against the Debtor for failing to honor an agreement to indemnify him, his demeanor suggested otherwise.[6]

The remaining evidence supporting the Trustee's allegation that the Exchange Agreement was back dated can be found in the books and records that reflect the details of effecting the transfer. For example, Bill received a $3000 distribution from Spatz & Co., twice a month, through May 1990. In May of 1990, Wendy finally began receiving the $3000 distribution. Bill explained that it was a computer generated check, automatically deposited to their joint account, so it did not matter whether he or Wendy was the payee. He testified that the error on the distribution was not caught and corrected until the accountants were reviewing distributions in about April 1990. The other aspect of this transaction was the transfer of Bill's interest in their residence to Wendy. Once again, the deed effecting the transfer was not recorded until July 1990.

The Trustee also points out that amendments to the CASP were prepared and executed as of January 4, 1989 ("Third Amendment"), days before the Exchange Agreement was purportedly entered into. When questioned why he executed the Third Amendment, David responded that he probably went ahead and signed it because he did not have the Exchange Agreement yet. Also, the amendments documented the prior year's advances. So it would have been necessary to document the 1989 loans. A fourth amendment (to P.Ex. 47 only) was also prepared in January 1990 even though the loans had allegedly been released, but it was never executed.

On the other hand, there is significant independent evidence establishing the date of transfer in the income tax return for Spatz &

Co. On the 1989 tax return, and in the corporate records, Spatz & Co recognized income from debt forgiveness of over $2 million. Clearly if the Exchange Agreement had not been made until 1990, as the Trustee contends, the income would not have been recognized by Spatz & Co., in 1989. In fact it would have been advantageous to delay recognition for one more year.

In addition, there was also significant testimony concerning several financial statements of the Debtor dated May 1989 and December 1989. Spatz & Co., was listed as an asset on one version of a May 31, 1989 financial statement (P.Ex. 22), but not on another version bearing the same date (D.Ex. 22), nor on a later statement dated December 31, 1989 (P.Ex. 11). Based upon the testimony presented, this Court finds that both of the May 31, 1989 financial statements were drafts and that the Defendants' Exhibit 22 (which did not list Spatz & Co.) was the later draft.

Despite certain inconsistencies in the evidence, the information contained in the tax returns and financial statements is highly probative, and the Court finds that the date of the transfer was January 1989.

2. *Spatz & Co.'s Activities and Operating History.*

Spatz & Co. was involved in several different aspects of the real estate business, including development, management, leasing, some brokerage and other miscellaneous activities. A significant portion of the business of Spatz & Co. was tied to the Debtor's other enterprises. It was the administrative vehicle for the development of the limited partnerships. It was hired by Spatz Real Estate Management Inc., ("SCM") to perform the work under SCM's management contracts, (and as the testimony related to SCM established, Spatz & Co., did the maintenance work for 1.2% of revenues, substantially below the 3% fee in the industry).[7]

---

6. Apparently, Mr. Faigus was within hours of losing his house after being sued by Balcor on a guarantee of Spatz & Co. debts. Although Faigus believes the Debtor had an agreement to indemnify him for any such claims, the Debtor refused to do so. Hours before the foreclosure was to be completed, David Spatz wired $50,000 to save his house in exchange for Mr. Faigus's interests in some Spatz-related partnerships.

7. SCM is a topic for Count III, and is described below. For now, it is enough that SCM was hired to manage certain properties at 3% of revenues and then subcontracted the work to Spatz & Co. at the equivalent of 1.2%. Spatz & Co agreed to perform the work at below market rates because the Debtor got a cut of the fee at the SCM level.

The Debtor testified and tax returns confirmed that Spatz & Co. never made money; it was not set up to make money. Its purpose was to manage projects; the projects were where the money was to be made. He explained that Spatz & Co.'s business was only about 35% management, the balance of its revenues came from leasing, maintenance and miscellaneous activities. The only "profitable" year was 1989, but that was due solely to the income from forgiveness of David's loans. Without the income from debt forgiveness, there would have been no profit in any year.[8]

### 3. Assets and Liabilities of Spatz & Co.

#### a. Assets

The balance sheets included in the corporation's income tax returns indicate the company had assets of between $1.7 M and $3 M in the years 1986 through 1988. But almost all of those assets were advances to affiliates. The advances were written off in 1989 and the balance sheet for that year then reflected total assets of less than $400,000. The company did not own any land, but did apparently own a building. This was valued at just over $200,000 and was almost fully depreciated by 1989.

#### b. Liabilities

##### i. Contingent liabilities

Loans from David and Bill represented most of the liabilities listed on the balance sheet as of January 1989. Chicago Heights National Bank, however, had a claim that resulted in a judgment after the transfer for more than $300,000. Atlas Distributing also claimed amounts due in excess of $50,000.

##### ii. Treatment of loans made by David Spatz

The Trustee contends that loans made by David to Spatz & Co., were not true loans, but equity contributions or gifts to his son. The existence and amount of the loans are established by the initial CASP dated January 2, 1986, and later amendments. See P.

Exs. 47 and 350. David testified that he always loaned money to Spatz & Co and Bill guaranteed the loans. The CASP was amended annually to reflect additional loans made over the prior year and any change in the collateral. The last amendment to CASP before the Exchange Agreement, shows loans of over $4 M. See P.Ex. 47, 350, Jan 1988 Amendment.

The Trustee disputes the validity of the loans and pointed out several inconsistencies in the parties treatment of the loans and collateral. For instance, no financing statements were ever filed to perfect the pledges under the Uniform Commercial Code. David never acknowledged imputed interest on his tax returns, although he testified that he was a cash basis taxpayer and only recognized income and expenses actually received or paid, and he was never paid any interest on the loans. There is also a question concerning whether the Debtor's interest in the Glencoe residence was in fact given as collateral. While both Bill and David testified that was the intent, no mortgage was ever created, somewhat surprising for two individuals experienced in the real estate business. The Trustee points to that omission as evidence that the advances were never intended to be true loans. The Trustee also points to the existence of two separate sets of CASP, compare P.Ex. 47 to 350, which appear to document the same agreement, with some slight differences. But both sets reflect loans, so both are consistent with the Defendants' contentions.

Although the Trustee argues that all of this inconsistency refutes the existence of any loans by David to Spatz & Co., this Court disagrees. There is significant documentary evidence that establishes that David made loans to Spatz & Co., guaranteed by Bill Spatz, of at least $3 Million. The liability was reflected in several financial statements of the Debtor. The Debtor's December 31, 1987, personal financial statement

---

8. The following is a summary of the operating results for 1986–1990 as reported on the corporate income tax returns:

| YEAR | 1986 | 1987 | 1988 | 1989 | 1990 |
|------|------|------|------|------|------|
| NOI | ($343,685) | ($11,666) | ($363,171) | $1,635,181 | ($190,428) |

NOI = Net Operating Income; ( ) indicate an operating loss.

Without the debt forgiveness, the result in 1989 is a net operating loss of ($683,732).

(P.Ex. 29), for example, lists Spatz & Co., as an asset. In a footnote it sets forth a balance sheet for Spatz & Co., that shows loans from David of $2.785 million. (That balance sheet also shows advances to affiliates of $2.193 million. Bill testified that the difference of $650,000 is what went to Spatz & Co., for operating expenses, the balance having been invested in projects and shown as the advances to affiliates.) And, although there was no mortgage, that financial statement also contains a note that, "Any increase in fair market value and equity in the home has been pledged to David Spatz."

The most significant evidence that David made loans to Spatz & Co., and then released the indebtedness as part of the Exchange Agreement, however, is the fact that Spatz & Co., recognized income from debt forgiveness on its 1989 tax return in the amount of $2,167,457.[9] In addition, the parties took the trouble over several years to document the loans with the CASP, even if they did not perfect the liens.

■ The Trustee points out that projects were starting to fail as early as 1989, but David still "loaned" more money. He argues that David was only helping his son and never would have enforced the loans against the Debtor. But that is not the issue. We are concerned here with the effect of these advances on the value of Spatz & Co. The Defendants are not arguing that these were shrewd investments. There is no doubt that David was motivated by a desire to help his son. But that does not mean the advances were not loans, at least in the sense that David expected to be paid if and when any of the projects were successful, or out of the proceeds of any liquidation of assets. David testified he wanted to keep other operations alive. The Court finds that these were loans in the sense of being legitimate and enforceable claims against the assets of Spatz & Co. If that entity had been liquidated either voluntarily or in a bankruptcy or other proceeding, David would have been entitled to payment.

### 4. Expert Testimony

The experts who testified regarding the value of Spatz & Co., were Mary Warmus on behalf of the Trustee, and the Debtor on the Defendants' behalf. Ms. Warmus is a CPA, with experience valuing business interests. While the Debtor does not have any particular credentials such as a CPA or MAI designation, the Court concluded that based upon his overall experience in the real estate business, he was qualified to testify as an expert.

#### a. Warmus

Warmus determined that Spatz & Co., had a value of between $745,000 and $802,000 as of January 1, 1990. She arrived at this conclusion by capitalizing a "normalized" net income for 1989. First, she adjusted revenues to reflect the extraordinary nature of the income from debt forgiveness. She then determined that the "Company's expense structure [was] not normal for its industry" and normalized expenses by comparing market statistics taken from Robert Morris Associates ("RMA"). Because RMA did not have an exact comparison, she used statistics for Management Consulting Services. She justified "normalizing" expenses on the ground that new management would be able to control costs and turn the company around.

After normalizing expenses, she deducted actual depreciation and interest to arrive at "Normalized Earnings Before Tax" of ($18,891). She then computed income tax at 38% (on the loss) and arrived at "Normalized Net Income" (Loss) of ($11,712). She then added back in interest and depreciation to arrive at a "Debt Free Cash Flow" of $139,744 and capitalized at a weighted average cost of capital ("WACC") of 13%, after deducting long term inflation of 3%. From that figure she deducted long term debt to arrive at the fair market value of equity of $744,952. She applied this same method, but normalizing expenses to Management Services Companies, to arrive at a value of $802,358.

At risk of oversimplifying, what all of this means is that she found what she believed to be Spatz & Co.'s industry (or close to it) in a

---

9. The loans were apparently more than this, and no explanation has been offered for the difference. It does not matter, however, because even

an indebtedness much less than $2 million would

reference book that lists typical expenses (as percentages of revenues) for such firms. She used those "normal" expenses instead of the actual expenses on the theory that a new owner could control expenses and bring them into line with the "norm." A bidder would calculate value on the basis of expected expenses, so normalization is a way of squeezing out excess. She deducted the normalized (hypothetical) expenses from actual revenues, and adjusted for depreciation, interest, taxes and long term debt to get the projected cash flow to a new owner. She then "capitalized" that cash flow by determining a rate of return a bidder would demand and dividing the cash flow by that rate. The result is the amount the bidder would pay to get that return. As we shall see, a lot depends on the validity of the normalization procedure as applied to Spatz & Co., as well as her choice of a standard for normalized expenses and the validity of her other adjustments.

The Exchange Agreement is dated January 10, 1989, but, Ms. Warmus valued Spatz & Co., as of January 1, 1990. She said she had made a mistake by valuing the company as of January 1990, rather than January, 1989. Unfortunately a mistake of this magnitude, particularly where the report itself refers to a Exchange Agreement dated January 10, 1989, causes this Court to question the care Ms. Warmus' took in her analysis.

In addition, there were substantive aspects of the Warmus valuation that cause this Court to reject it. Probably the most significant is her decision to reject actual expenses and instead "normalize" the expenses using statistics. This Court does not reject per se the view that expenses should be normalized because new management would have the ability to control costs. However, the statistics selected by Warmus were for a Management Services company, which, by definition, does not provide operating staff. Spatz & Co., on the other hand, did provide operating staff. This fact alone would account for sig-

nificant differences in operating expenses, particularly payroll.

The other statistics used by Warmus were for Management Consulting Services, which perform activities such as "marketing objectives and policies; information systems and planning, evaluation and selection; human resource policies and practice planning; and production scheduling and control planning." Spatz & Co., on the other hand, performed real estate management and leasing services (only about one-third of its income was derived from management services), development of real estate projects and maintenance. Neither of the two types of companies used by Warmus involved real estate management or development.

There is another problem with Ms. Warmus' approach. No outside purchaser could rely on the income from the management contract with SCM. The management contract was terminable at will and tied to Bill owning at least 1% of Spatz & Co., and being involved in day to day management. But Warmus assumed the continuation of that revenue after a sale to an outsider. Worse, although Spatz & Co., lost money on the SCM contracts, Warmus took the revenue into account, and then effectively reduced the associated expenses by "normalizing" them. Since normalized expenses are calculated as a percentage of revenues, she effectively converted unprofitable contracts into profitable ones by the stroke of a calculator.

Another major problem with Warmus' valuation was that by valuing it as of 1990, the liability to David Spatz of more than $2 million was no longer reflected on the balance sheet, but had been discharged by the Exchange Agreement. If the company had been valued just before the transfer with the liability still in existence, the value would have been significantly lower since any other purchaser would have taken the Spatz & Co.. stock subject to the corporation's liability to David Spatz[10]. She also failed to consider

---

have a dramatic effect on the value of Spatz & Co.

**10.** The 1990 balance sheet reflected neither the loans from David nor the advances to affiliates. While at first glance one appears to almost offset the other, from a purchaser's perspective that is not true. An independent purchaser would have

determined that the advances to affiliates were worthless, but would have been required to take the stock subject to the liability to David. The Trustee suggested that it could sell the assets free and clear of the debt. Even assuming relevance under the valuation standard we are using, however, there really were no assets, except the building.

other contingent liabilities of approximately $400,000. For these reasons, this Court will not rely on the value set by Warmus in her report. As a practical matter it is difficult to believe than anyone would pay three-quarters of a million dollars for a company that had never made a profit, required significant capital infusions to fund operating losses and had no long term management contracts to rely on for future profitability, even if new management could reduce costs.[11]

### b. The Debtor

Assuming David's debt was $3.3 M, the Debtor concluded that Spatz & Co., had a zero value prior to the transfer. Assuming no debt to David, based upon operating losses and contingent liabilities, the value was still zero. It had no long term management contracts.

On rebuttal, the Debtor showed that if the Court accepted every aspect of Ms. Warmus' valuation and deducted only the contingent liabilities she failed to consider, the value of Spatz & Co., was at most $314,593. He also performed several other analysis, making only minor adjustments to Warmus' report to show that Spatz & Co. could have no value. First he pointed out that it was erroneous to include interest and depreciation. The interest expense of $115,000 was clearly excessive in relation to the remaining debt of $300,000. Second the assets were almost fully depreciated at the end of 1989,[12] so there would be nothing to depreciate in future years. With these two adjustments the equity value would be approximately $300,000, without considering either the David loans or the contingent liabilities. Finally, by using the same method Warmus used (and the same income and cap rate), but using actual expenses, the Debtor concluded that the value of the equity was ($330,000) without considering any liabilities and ($760,350) if only the contingent liabilities were deducted.

This Court agrees that it was inappropriate to adjust for depreciation since the assets were almost fully depreciated and any purchaser of the stock would not obtain an adjusted book value to depreciate. It would be appropriate to include depreciation only if the assets were sold, because then the purchaser would obtain a new basis in the assets that it could then depreciate. But the asset being valued is the stock. This court also agrees that it was inappropriate to adjust for interest since most of the debt had been discharged and interest of $115,000 was clearly excessive in relation to the remaining debt of about $300,000. Finally, the Debtor concluded that Spatz & Co., had a negative value if either income from SCM management contracts were eliminated from Warmus' valuation, on the basis that they could be canceled at will, or alternately if the value were computed using actual income and expenses.

■ It is true that financial statements for 1988 and 1989 showed very high values for Spatz & Co. Those statements reflect badly on the Debtor's credibility, but they are, at best, weak evidence of the value of Spatz & Co.[13] They are also not Wendy's or David's

---

11. There was one other major contradiction in her testimony: at the beginning, she defined fair market value—willing buyer, willing seller, no coercion—and said she was valuing Spatz & Co. at fair market value. At the end of her testimony, she said she valued Spatz & Co. in the Debtor's hands and that is why she didn't consider it relevant that management contracts could be canceled. So, she did not consider whether the contracts could be terminated, but only looked at total revenue.

12. Net book value of the building was $28,159 at the end of 1989.

13. The Trustee contends that the debtor is bound by the values of assets set forth in prior financial statements, relying on In re Thomason, 202 B.R. 768 (Bankr.D.Colo.1996). Thomason does not, however, stand for the proposition that a valuation for one purpose is binding evidence of value for every other purpose. The only aspect of a valuation disputed by the debtor in Thomason was a line item deduction of $20,000 for brokerage fees reported on the closing statement. The debtor stated that the fee was "just for tax purposes" and had not really been paid. In response the court said:

> What they are saying is that they have perpetrated a tax fraud by indicating certain facts in documents that are not true, and they know they are not true, in order to lower their tax liability. People seem to have the idea that it's all right to lie to avoid the payment of taxes. But then when that lie would just them before this Court, they "come clean" and testify as to the "true" facts. This Court doesn't buy it. If in 1992 they signed a document stating that the $20,000 was a legitimate broker's fee and they only received a net of $11,924, then they must live with that statement today. [Id. at 773.]

Although there is some similarity between this Court's distaste for baseless valuations and the

admissions.[14]

### B. *Value of Properties Transferred Compared to Consideration Paid.*

The Court concludes that Spatz & Co. had no value as of the date of transfer, January 1989. Therefore, the value of the consideration received for the transfer is immaterial.

### COUNT II

#### *Summary of Transaction*

Pursuant to an Agreement dated January 1, 1990 between the Debtor and Wendy, the Debtor transferred the following assets to Wendy:

1) 90% of Bill's interest as general partner in Fort Wayne L.P.,

2) 100% of interest in S & C Maintenance Corp. "Partners",

3) 100% of Spatz & Co., Development Corp., and

4) 100% of American Retailing Corp.

The Agreement required Wendy to pay $25,000 for the assets.

#### *Factual Issues*

I. *The property transferred.*

There is no doubt that the $25,000 was paid. The Debtor testified that he came up with this price by allocating $15,000 to Fort Wayne, based upon a recent sale, and the balance, $10,000, to the other properties because he did not think they were worth anything.

There is a question about what interest in Fort Wayne was transferred for the $25,000. The Agreement says only that he assigned "90% of his right, title, and interest as general partner." There is an issue as to whether the Debtor owned a 10% or a 14.46% interest in Fort Wayne (that would mean he transferred either 9% or 13.46%) at the time of the transfer.

Pursuant to the Amended and Restated Certificate and Agreement of Limited Partnership of Fort Wayne Assoc., William Spatz was the sole general partner and held a 10% general partner interest (P.Ex. 127). However, Empro sold a 9% limited interest back to the partnership in March 1989 (for $15,-000, Def. Ex. 36). This interest was offered to other partners, pro rata, but 4.46% remained unsold and Wendy ended up buying that in March 1990 for about $8000. The problem is that while that 4.46% interest was unsold, several documents and letters sent to the limited partners showed it as the Debtor's interest. Relying on these documents, the Trustee concluded that the Debtor owned 14.46%, and 90% of that, or 13.46%, was transferred to Wendy.

The Debtor contends that he never owned that additional 4.46% interest and that the only reason documents and letters showed it as belonging to him was because 1) it had to be allocated somewhere and 2) it was done, at least in the letters, to show the other partners what he would end up owning if no one else bought the interest.

The Court found the answer to the question in the partnership agreement itself. The only general partnership interest was that created by the Agreement of Limited Partnership (P.Ex. 127)—the 10% interest owned by the Debtor. The interest sold by Empro was a limited partnership interest. There was nothing in the partnership agreement that provided that if a general partner purchased a limited partnership interest that it would become a general partner interest. Whether or not he acquired the Empro limited interest, he never had more than 10% interest as general partner. Since the Exchange Agreement was limited to his "interest as general partner," the Court therefore concludes that the Debtor transferred 90% of his 10% general partnership interest, or 9%, to Wendy.

### II. *Values of the interests transferred*

The Defendants had William A. McCann of William A. McCann & Associates, Inc., testi-

*Thomason* Court's disgust for tax fraud, there is one important distinction: there is no outright lie contained in the debtor's inflated statements. He did not misstate prior earnings or attempt to conceal significant liabilities; rather, it was clear from the underlying numbers that the basis for his value was a highly optimistic forecast of increasing reve-

nues and that if those numbers could not be met that there would be continuing losses.

14. Wendy did sign one such statement. (P.Ex. 55) But the Debtor testified that he prepared it, and it is dated well after the transfer. In any event, it does not overcome the other evidence of value.

fy as to the value of the interests transferred in Sioux Falls, Neenah, and Fort Wayne. Mr. McCann is an experienced real estate appraiser and consultant. This Court also allowed the Debtor to testify as an expert on the value of all of the properties transferred.

The Trustee relied upon Mary Warmus as his expert. Ms. Warmus is a CPA, with experience valuing businesses, but not real estate. Because several of the interests transferred could only be valued by valuing the real estate owned by the partnerships, this Court concluded that Ms. Warmus was not qualified to testify as an expert on the real estate entities. Accordingly, Ms. Warmus was not permitted to testify on the values of Fort Wayne, Sioux Falls, Neenah and Meadowlane. The Court did, however, permit her to comment and opine on the relevance of comparable sales available for those properties.[15] The Trustee, therefore, had no expert testimony concerning the value of Fort Wayne.

■ The values of the interests transferred are fair market value, what a willing buyer would pay a willing seller in an arms length transaction.[16] As such, the valuations take into consideration the nature of the properties, the nature of the interest sold and the overall market at the time of transfer.

### Fort Wayne

The Fort Wayne property was a shopping center in Fort Wayne, Indiana. It was completely constructed and operating. McCann valued the partnership interest using the income capitalization approach. He applied a capitalization rate of 12% to arrive at an overall value of $2.381 million.[17] The debt was a little less than $2.110 million, leaving an equity value of $270,895. Allocating arithmetically for the 9% interest purchased resulted in a value of $24,381. McCann then deducted 50% for a minority interest to arrive at a value of $12,190.

The Debtor relied principally on the comparable sale by Empro of a 9% interest one year earlier for $15,000. The two cannot be compared since the sale by Empro was a limited partnership interest. He also valued the interest based upon net cash flow after debt service of $20,000. Assuming an interested purchaser would require a 10% return to purchase the cash flow,[18] the Debtor concluded that the partnership had an overall value of $200,000, and a 10% interest had a value of $20,000. He then deducted 35% for a minority discount to conclude that the interest transferred had a value of $13,000. The Debtor also testified that the value was affected by the overall conditions in the real estate market, which were deteriorating.[19]

15. Because of the scheduling of this trial, with the Defendants presenting their case first, the Defendants impeached various aspects of the Warmus report, before the Court ruled on her qualifications. That testimony was obviously unnecessary and will be disregarded. The portions of the Warmus report related to the real estate entities (Parts I, II, III and IV) will also not be considered to be part of the record.

16. In *Bay State Milling Co. v. Martin*, 145 B.R. 933, 947 (Bankr.N.D.Ill.1992) the court determined that in a fraudulent conveyance action the property transferred should be valued from the creditors perspective—"what creditors could realize through exercise of their legal rights." This would suggest a liquidation value rather than fair market value, since a creditor attempting to levy on an asset must frequently force a sale under less than favorable circumstances. Under the circumstances of this case, where the Defendants are presenting a defense of "full consideration" and have assumed the burden of proof, this Court will require them to establish that the "full consideration" was at fair market value and not liquidation value. Both parties apparently recognized that fair market value is the more appro-

priate standard here and based their analyses on that method.

17. McCann testified that he used a 12% cap rate based upon the following factors: 1) the debt level; 2) the rates suggested by various reporting services relied upon in the industry; 3) the condition of the property; 4) his own experience valuing and buying and selling other properties; and 5) rates on alternative investments. McCann used a higher rate on the Fort Wayne property than on Neenah and Sioux Falls (discussed in connection with Count III, below) to reflect the age of the property, and its deferred maintenance.

18. Rate of return is not synonymous with capitalization rate.

19. In a December 31, 1987 financial statement, the Debtor had valued his 10% interest in Fort Wayne at $80,000. He explained that at that time he was in the process of negotiating a lease with K–Mart and the value was based upon expected cash flow. Negotiations later fell apart. Again, we attach little significance to the Debtor's inflated financial valuations.

■ Warmus was not qualified to testify as an expert about the value of this real estate interest, so the Trustee had no evidence of value. The Court found McCann highly qualified and his methodology well supported and logical, with one exception. The interest sold was a general partnership interest.[20] The general partner is the one who controls and manages the partnership. Therefore it was inappropriate to take a minority discount and the Court finds that the value of the interest in Fort Wayne was $24,381.

### *S & C Maintenance Corp. ("S & C")*

S & C was formed in the early 1980's to do maintenance for shopping centers and was sometimes hired by Spatz & Co. It ceased doing business in 1986 or 1987, and its name was changed after the transfer (in 1991) to Spatz Partners. The income tax returns for 1988 showed no activity. There were no returns for 1989 or 1990 because no business was conducted in those years.

Warmus valued S & C at $10,000 based upon an equity balance of $9,951, shown on the 1987 and 1990 balance sheets. The balance sheets indicate that the asset was an account receivable. The Debtor testified that no one knew what this receivable was for; there were no records of that account and it was eventually (1991) written off.

■ The receivable was at least three years old, since it was listed on the 1987 balance sheet. An account receivable of unknown origin, owed by an unknown account debtor, that was at least three years old, has no value. Accordingly, S & C had no value.

### *Spatz & Co. Development Corp., and American Retailing Corp.*

The Trustee concedes that these entities had no value at the time of transfer.

### III. *Value of Properties Transferred Compared to Consideration Paid.*

The total value of the assets transferred to Wendy under the January 1, 1990 agreement was $24,381. The Debtor received $25,000 in return. Therefore, the Debtor received full commensurate value.

### *COUNT III*

### *Summary of Transaction*

The Debtor and David allege that they entered into a Purchase and Sale Agreement dated January 11, 1990 (the "Sale Agreement"), pursuant to which the Debtor transferred the following property to David on or about that date:

1) 76% of limited partnership interest in Neenah Associates L.P.;

2) 76% of limited partnership interest in Sioux Falls Associates L.P.;

3) 5% of general partnership interest in Meadowlane L.P.[21];

4) 49% of a 50% ownership interest in Spatz Real Estate Management Corp., ("SCM"); and

5) 44% interest in Montgomery II Associates Limited Partnership.

### *The Parties' Contentions*

The Trustee contends that the Sale Agreement was entered into, if at all, after August, 1990, with the properties transferred after that date.[22] The Trustee further contends

---

**20.** His report states that he valued a "9.00% *limited* partnership interest." The Debtor apparently believed that the sale of a general partnership interest caused it to convert to a limited partnership interest and may have told Mr. McCann that. The Court found no such provision in the Limited Partnership Agreement for Fort Wayne, although the Neenah and Sioux Falls agreements did contain such a provision. The only affect on McCann's analysis is the final discount, which can easily be disregarded.

The partnership agreements, like most, attached conditions to the transfer of general and limited interests, such as consent. There is no evidence that those conditions wee satisfied with respect to any of the transfers, but no issue has been made about that. In any event, the trans-

ferees were dealt with as if the transfers were effective.

**21.** The Sale Agreement states that 5.5% of Meadowlane was sold to David, but this is in conflict with other documents, including the tax returns, which indicated that 5% was sold. The small difference (0.5%) has no effect on the availability of the full consideration defense.

**22.** The dates of the transfers of the assets are relevant because if the transfers were made to an insider within one year of the filing of the petition, then the trustee may be able to recover the transfers under the preference sections of the Bankruptcy Code (§ 547) and of the UFTA (740 ILCS § 160/6(b)).

that the $1.1 million paid to the Debtor in the Fall of 1989 was not for the purchase of the properties, but was either a gift or loan to the Debtor.

The Defendants contend that David paid $1.1 million to purchase the properties, as described in the Sale Agreement, and the transfers were made in January 1990.

### Factual Issues

1. *The Agreement and Payment.*

The Sale Agreement is dated January 11, 1990, but the Trustee alleges that it was back dated and not entered into until late 1990. The only evidence the Trustee relies on to support this allegation is the testimony of Faigus, which this Court finds is not credible. He testified that he drafted the Sale Agreement in May or June, 1990 and that he revised the document shortly before he left Spatz & Co., in August, 1990. During a deposition taken two years earlier he had testified that he drafted the Sale Agreement about the end of 1989 or early 1990. His only explanation for the inconsistency was that his memory was better now.

The evidence presented by the Debtor and Defendants, on the other hand, establishes that the Sale Agreement was executed on or about the date it bears. First, there is evidence that David paid the Debtor $1.1 million over a period of about 45 days, between October and November, 1989.[23] The parties testified that the actual transfer and agreement was not made until the beginning of the year to make it easier for accounting and tax purposes. This was consistent with the manner in which the parties conducted other transactions, such as the Collateral Assign-

ments and the Exchange Agreement (both discussed in connection with Count I).

In addition, David produced a handwritten letter dated November 29, 1989, asking Faigus when the agreement would be completed. Although the Trustee questioned the authenticity of those notes, the Court found them to be authentic and credible. During rebuttal, David also produced earlier drafts of the Sale Agreement he found in his files.[24] The first draft (Def.Ex. 81) bears the date June 21, 1989 and indicates that initially David was going to lend $1.1 Million, with Neenah and Sioux Falls as collateral. David testified that he decided he did not want to lend any more money and the deal was changed to an outright purchase which is reflected in the second draft of the Sale Agreement (Def.Ex. 82). Although Ex. 82 is undated, it is clear that it was an interim draft, as it refers to an "option" and "put" that were removed from the final agreement. In fact the November 29, 1989 handwritten memo by David asked Faigus to prepare the final document, promptly, without the put. David stated that the final agreement was prepared shortly after his memo and believes it was sent to him in Florida in January, 1990.[25]

It is clear that the $1.1 million was not a negotiated price for the assets. The Debtor requested that amount to support various of his failing enterprises. Both the Debtor and David testified that they agreed to the sale because David was tired of loaning money to Bill and instead wanted to own something. The Debtor prepared a summary of how he used the money from David (Def.Ex. 60). If the money was lent to other entities owned by the Debtor that is reflected in the ledger

23. The first three checks referenced a purchase of West Bank. The parties explained that David was initially going to purchase West Bank, but they abandoned that sale after it appeared that there would be litigation with another partner in West Bank who was an old friend of David's. The next three checks reference Neenah or Sioux Falls. The last check merely said "loan." David and the Debtor testified that this was an error.

24. David stated that he looked for drafts when he heard about Faigus' testimony. The court concluded that David had produced these files for the Trustee during discovery and admitted the drafts.

25. On cross examination the Trustee questioned David about how he located the drafts of the Sale Agreement and also on how the deal was changed from initially involving the purchase of West Bank. David testified that he didn't recall that West Bank was ever part of the Sale Agreement. This testimony was contrary to his prior testimony during the Defendants' case in chief when he explained that West Bank was abandoned because of a possible lawsuit with a friend of his. He had also explained that was the reason the first checks referred to West Bank. This court does not believe the differences in David Spatz' testimony indicate any intent to deceive or create a story, but are merely due to his age and fading memory.

of Spatz & Co. (Def. Ex. 30, account # 1250, shows inter-partnership loans.)

### 2. *When the Property Interests were Transferred*

#### (A) *The Partnership Interests.*

The Debtor and David's testimony that the properties were transferred at the beginning of 1990 is corroborated by income tax returns for the partnerships. The 1989 U.S. Income tax return for Sioux Falls shows the Debtor owned 76% of the limited partnership interest and David owned 10%.[26] (P.Ex. 85). The schedule K–1 attached to the 1990 return for Sioux Falls shows a transfer of 76% from the Debtor to David. The income/loss for the 1990 period is allocated all to David and none to the Debtor. This is consistent with the parties' testimony that the reason they structured deals at the beginning of the year was for ease of accounting and income tax allocations. The income tax returns for Neenah were similar (P.Ex. 96, 97).

The K–1's attached to the 1990 Meadowlane income tax return (P.Ex. 106) showed a transfer of a 5% interest from the Debtor to David, leaving the Debtor with a 0.5% interest. The allocation of the 1990 income/loss between the Debtor and David was again consistent with the Debtor owning only 0.5% throughout the year and David owning 5.5%. No returns for Montgomery were included in the evidence. This may because the Trustee has conceded that Montgomery had no value. Finally, Burt Chudacoff, the other 50% owner of the stock of SCM, testified concerning conversations he had with the Debtor about the transfer of SCM stock. Mr. Chudacoff testified that in one of those conversations, the Debtor told him that he had sold the SCM stock, along with several other properties, to his father for $1.1 million. That conversation took place in the summer of 1991, and the Debtor told Mr. Chudacoff that the sale to his father was about one and a half years earlier, which would put it right about January, 1990.

#### (B) *The SCM Stock.*

The Sale Agreement provided for the sale of 49% of the stock in SCM to David. David testified that he was told SCM had no value to him because the management contracts could be canceled and because income could be treated as "salary." David said he therefore consented or "gave my permission" to transfer SCM to Wendy. There is no evidence that David ever received an interest in SCM. There is significant evidence establishing that SCM was transferred directly from Bill to Wendy. The K–1 [27] for partial year ending October 31, 1990 (P.Ex. 134) shows Wendy owning a 8.33% interest; the K–1 for the period November 1, 1990 to December 31, 1990 shows Wendy owning 50% of SCM. The books and records also reflect distributions first going to Bill and then to Wendy as of September, 1990.

Mr. Chudacoff testified that he questioned the Debtor about the transfer when he saw Wendy listed on the K–1. He was concerned because he had a right of first refusal if Bill transferred his interest in SCM. As previously stated, the Debtor initially told Mr. Chudacoff that he had sold SCM, along with several other interests, to his father for $1.1 million. In a subsequent conversation, the Debtor changed his story and said that he gave his interest in SCM to Wendy. Mr. Chudacoff kept requesting copies of the transfer documents, but Bill told him that no documents had been prepared yet.[28] Although it is clear that Mr. Chudacoff and the Debtor are not on the best terms, his testimony supports the finding that SCM originally was to be sold to his father in January, 1990, but instead the Debtor gave it to Wendy.

### 3. *Values of the Properties*

McCann testified as to the value of the interests transferred in Sioux Falls and Neenah. The Debtor testified as an expert on the value of all of the properties transferred.

---

**26.** David was given a 10% interest as part of another deal that is not at issue here.

**27.** SCM was a "subchapter S" corporation, so it reported distributions to owners on K–1 schedules, as do partnerships.

**28.** By the time of the July 1991 meeting between Chudacoff and the Debtor, the Debtor had been deposed in another matter and had produced the Sale Agreement at that deposition. So the Sale Agreement did exist at that time, but no documents effecting a transfer to Wendy have appeared in the record.

As previously stated, Ms. Warmus was not permitted to testify on the values of Sioux Falls, Neenah and Meadowlane. The Court did, however, permit her to testify about the relevance of comparable sales available for those properties. The Court used a fair market value standard, as discussed in the Count II section.

### (A) Limited Partnership Interests in Neenah and Sioux Falls

The Neenah and Sioux Falls developments can both be described as strip shopping malls in small Midwestern markets, Neenah, Wisconsin and Sioux Falls, South Dakota. At the time of the transfer, Neenah and Sioux Falls were under construction and not even close to being fully leased. Only the grading, and installation of footings and foundations were complete. Neenah had one lease with Kohl's Food Store and Sioux Falls had a lease with Shopko. The Shopko lease was only a ground lease; Shopko had built and owned its own store. Moreover, the real estate market was moving into a downturn in the late 1980's and early 1990's, with a number of real estate developments failing.

■ Because the only assets owned by the limited partnerships were real estate parcels, the beginning point is the value of the real estate. The values arrived at by McCann presumed stabilization. This meant that he presumed the properties would be completed and then leased at close to full occupancy. However, a limited partner does not have a direct interest in the real estate. By law, a limited partner cannot participate in the management of the partnership. By the terms of the limited partnership agreements for Sioux Falls and Neenah (P. Exs. 90 and 99), the limited partner had no management control and no authority over the partner-

ship. The limited partner could not force a sale, but 51% of the limited partnership interests did have to vote to approve a sale. The general partner had control over distribution of proceeds from refinancing and other events. Further, a limited partner could only transfer or sell an interest with the consent of the general partner. The limited partnership interests must, therefore, be discounted for the lack of control and illiquidity.[29]

Barry Herring testified that he was the person primarily responsible for the development of Neenah and Sioux Falls. He confirmed that Neenah and Sioux Falls were close to 100% financed. The mortgages on both properties permitted pre-payment, but with significant penalties. The Debtor testified that the pre-payment penalty on Neenah would be approximately $1.5 million and the pre-payment penalty on Sioux Falls would be about $1 million. The partners tried to sell the Neenah project in 1991 for $600,000 over the debt, but were unsuccessful.

### 76% limited partnership interest in Sioux Falls

Mr. McCann again applied the income capitalization approach for valuation and concluded that the value of the interest transferred was zero. Although the property was under construction at the time of the transfer in 1990, he used the 1991 revenues and expenses, with the exception of certain expenses from a pro forma provided by the Debtor. By using operating results from nearly two years after the sale, he valued the property as of the transfer date on the assumption that the property would be completed and achieve a stabilized income. He then capitalized the net income at 11% to arrive at an overall value at stabilization of $2,631,827.[30] The debt on the property, how-

**29.** Although Ms. Warmus was not qualified to testify as an expert on the value of real estate limited partnerships, the Court did, however, permit her to testify solely on the possible value from comparable sales. Reviewing a prior sale of a 10% interest by Faigus, she determined that the interest probably reflected a 40% minority discount. She concluded that there should not be a minority discount here, as applied by McCann and the Debtor, because a 76% interest of the general partner was transferred. The Debtor's interest in both Sioux Falls and Neenah was a limited partnership interest, not a general

partner interest. Although 76% was a majority of the limited partnership interest, that still afforded little or no control over the partnership. Based upon the lack of control of a limited partner, this Court concludes that a minority discount should be applied, even where a majority interest of the limited partnership is transferred.

**30.** See footnote 17 for discussion of how McCann determined the appropriate capitalization rate.

ever, was in excess of $3.6 million, so the equity value, presuming stabilization and without even deducting for the 76% arithmetic interest or for the fact that a limited partnership interest was being sold, was negative.

The Debtor opined that the value was between $0 and $86,000. The zero value was premised upon his conclusion that the interest was "unsalable," given the status of construction, the lack of leases and the pre-payment penalty on the mortgage. He computed the $86,000 value based upon a "sale" by Eugene Faigus in 1991. A letter from the Debtor to his accountants indicates that Faigus "sold" his 10% interest in Neenah and 10% interest in Sioux Falls for $50,000. However, Faigus testified that he did not sell his interests for a negotiated price; rather, the $50,000 was the amount he needed to get out of his financial problems and in return he transferred various interests. Under those circumstances, this Court is unwilling to accept the Faigus transaction as a "comparable sale" and finds that it has no relevance to the fair market value of the interests sold to David.

The Debtor also testified that the project ultimately failed and was turned back to lenders.

Because the Trustee had no contrary expert testimony, and the court found McCann's testimony to be well reasoned, and because of the deteriorating real estate market at the relevant time, the Court finds that the interest in Sioux Falls had no value.

### 76% limited partnership interest in Neenah

McCann used the same income capitalization approach to valuing the interest in Neenah, which resulted in an overall value at stabilization of $5.284 million The debt was slightly less than this value, $5.022 million, so there was a total equity value of $261,754. After allocating arithmetically for the 76% interest transferred and discounting 25% for a partial ownership interest, McCann con-

cluded that the value of the interest transferred was $149,200.

The Debtor reached the same conclusion here, using the same analysis, as he did for Sioux Falls. He noted, however, that when McCann deducted the mortgage from the overall value, he failed to take into consideration the cost of removing the mortgage, the $1.5 million pre-payment penalty. If this had been taken into consideration, the overall value of Neenah, upon stabilization, would have been zero. The Debtor again considered the "sale" by Faigus, and that they tried to sell project in 1991 for $600,000 over debt but couldn't. D. Ex. 17.

Again Ms. Warmus was not permitted to testify as to the value of Neenah, but she did have the same comments about the discount applied for a partial interest, which this Court rejects for the reasons stated above.

For the reasons set forth above, this Court will accept McCann's value of $149,200.

### Meadowlane

The Meadowlane property is located in Marshaltown, Iowa, approximately 40 miles from Des Moines. Unlike the other limited partnerships sold to David, the Meadowlane partnership did not own the real estate. The partnership sold the property in 1986 and got a purchase money mortgage. There were also three other mortgages ahead of that lien.[31] The partnership commenced foreclosure proceedings on its mortgage in September, 1989. The owner of the property could have cured the default and reinstated the mortgage by paying $275,000, but did not. The foreclosure was completed in March, 1990, and once again the owner could have redeemed the property by paying $275,000, but did not.

As part of the deal with the buyer, the partnership provided a master lease, and paid "rent" sufficient to cover the senior mortgage payments. The rent, therefore, was not a reflection of market value. The master lease produced a positive cash flow and that is why revenues were much higher through 1989.[32] The buyer lost the master

---

**31.** One of the senior mortgages prohibited pre-payment and had a 16.75% interest rate.

**32.** Revenues for 1989 were just over $1 million. In 1990, when the master lease was no longer in place, the revenues dropped to $631,176 and the partnership had a net operating loss. A person

interested in purchasing the property in late 1989 to January, 1990, would have known that the master lease did not reflect market rental value. It is clear, therefore, that if the income capitalization method were used, after deducting

lease when it defaulted on the mortgage. It would have been reinstated had the buyer cured the default. The Debtor testified that the property was about 25 years old. The original 25 year old roof was still in place; the concrete parking lot needed continuous repairs; and overall the property needed more than $300,000 in deferred maintenance.

The Debtor concluded that the interest transferred was worth between $18,000 and $36,000, based upon book value and a comparable sale. (In 1993 a 1% interest in the partnership was sold for $4,500. This would mean a 5% interest had a value at that time of $18,000.) The 1990 partnership income tax return showed a net asset value of $1.165 after foreclosure, (total non-depreciated assets less long term debt and other liabilities); before foreclosure (when then partnership mortgage was still a liability on the books) the value was $568,000. This would mean a 5% interest was worth $28,400 to $58,250. The Debtor testified that this amount should be reduced 25–50% due to the small percentage being sold and the lack of marketability. Applying a 37.5% discount, and considering the comparable sale, he concluded the value of the interest sold was between $18,000 and $36,000.

Because this was a general partner interest, there should not be a minority discount, but there should be a discount for illiquidity. Under all the circumstances, the Court finds that the 5% interest was worth approximately $35,000.

### *Montgomery*

The Trustee concedes that the value was zero.

revenues provided by the master lease, that the overall value of the property would be zero.

33. The management fee was 3% of the revenues of the entity being managed. If Spatz & Co received 40% of this fee, it was in essence receiving 1.2% of revenues as its fee for performing the actual work. Barry Herring, who is still in the shopping center management business, testified that his fees are in the range of 3–5% and 3% was probably the norm back then. The arrangement made sense from Spatz & Co.'s perspective only because the Debtor personally got a cut of fees at the SCM level. (Recall that this Court previously found that Spatz & Co., was the Debt-

### *Spatz Real Estate Management Corp "SCM"*

SCM is a difficult company to value because, in many ways, its value was tied to the people who owned it. SCM managed shopping centers. It was formed by the Debtor and Burt Chudacoff to settle a lawsuit, pursuant to an agreement entered into November 1, 1983. Chudacoff controlled a number of shopping center ventures, which he caused to hire SCM to manage. SCM then hired Spatz & Co. to do the actual work of managing the properties for 40% of the management fees received by SCM. The balance of management fees paid to SCM was to be split equally by the Debtor and Chudacoff (with limited exceptions).[33]

The agreement allowed the Debtor to sell all but 1% of his interest in Spatz & Co, provided he remained involved in day-to-day operations. If he breached this covenant, the management agreements could be terminated by Chudacoff at will. The agreement also gave both owners a right of first refusal.[34] Finally the agreement stated that if either Spatz or Chudacoff caused the management contracts on any of the SCM Properties to be terminated, any fees either of them received from the later management company had to be divided equally. Mr. Chudacoff testified that his understanding of the management agreements was that they were for annual terms, but could be canceled without restriction upon 60 days notice.

Chudacoff testified that the K–1's for 1988 and 1989 were inaccurate, but by 1991 the K–1's were accurately reflecting the distributions received. Although the K–1's were inaccurate, the books accurately showed the distributions received in those years and established that both he and the Debtor received on average about $80,000 per year.[35]

or's alter ego.) This is just one example of how the values of SCM and Spatz & Co., were tied to a deal with an existing shareholder, and other entities owned by that shareholder.

34. That right would also affect the price an outside investor would be willing to pay because there was a risk that they would spend time and money negotiating an agreement only to have an insider step in and assume the agreement.

35. A great deal of time was spent comparing the K–1's received by the owners in 1988 and 1989, to the distributions shown in the general ledgers.

On direct examination Mr. Chudacoff testified that he would have paid at least $600,000 for the stock in SCM,[36] but acknowledged that a disinterested third party would probably pay only $100,000, the equivalent of one year's distribution, because of the risk that the management contracts would be terminated if an outsider acquired the interests. At the end of his testimony he said he would pay up to $600,000 and on cross examination he recognized that he would never have to pay $600,000 because the right of first refusal gave him the right to buy any stock sold by the Debtor at whatever price the independent third party had agreed to pay for it.

The Debtor valued the interest transferred at $40,000.[37] He calculated this value based upon 50% of the average distributions received by the each owner in each of the prior two years. (He testified that each received, on average, about $80,000, from all sources, distributions and salary). He concluded that a purchaser would only be able to rely on one year's distribution because the management contracts were terminable at will. Accordingly, there was a risk to any purchaser of the stock that the management contracts, the source of income, would be terminated. However, although Chudacoff disliked the Debtor, he did not cancel the management agreements until 1994.

As the Defendants emphasized in their closing arguments, SCM had an even more serious problem than the risk of cancellation of the management agreements. As noted, Spatz & Co. agreed to manage the properties for SCM at a below market fee only because that arrangement allowed the Debtor to collect an additional cut. If the Debtor lost or sold his entire interest in SCM to a stranger, he would have had no reason to allow Spatz & Co. to continue that sweetheart arrangement, and SCM could not have replicated it.

Undoubtedly, SCM would have had to find other, less advantageous means to do the work, reducing the return to the subsequent owner, even if the management agreements were not canceled.

Warmus valued a 50% interest in SCM at between $142,000 and $151,000. She computed the value based upon the income capitalization rate (using a 13% cap rate) using 1988 earnings. She made no attempt to normalize expenses based upon the fact that only a 50% interest was transferred, and thus no right to control management. Therefore, she used actual revenues and expenses. The fundamental problem with her approach is that it assumes that revenues would continue at the same level in the future—an unrealistic assumption in this case.

As we said at the outset of this section, SCM is not easy to value. The Court agrees that no rational outside investor would have paid more than one year's revenues—$80,000 for a 50% interest. It makes sense to deduct for taxes, although it is possible that an investor with tax losses (not a rarity in the late 80's) might have bid more than the annual after-tax cash flow. It is also possible, although speculative, that a bidder might have been willing to pay for the opportunity to form a successful relationship with Mr. Chudacoff, and thereby continue the business beyond one year. Against this, however, is Chudacoff's right of first refusal. His testimony that SCM was worth $600,000 to him (because he controlled the continuation of the firm's business) effectively means that nobody but he would have bought the business, and he would only have had to pay what an outsider would have bid. Anyone analyzing the business would have recognized that it had its greatest value to the holder of the blocking right of first refusal, and that knowledge would have chilled the bidding.[38]

Without question, the K-1's were inaccurate. Whether they were inaccurate because part of the money was treated as salary and part as a distribution, or because someone wanted to fool the IRS is unclear. It is also unclear why all that testimony was necessary, so long as, for valuation purposes, all the income to shareholders was treated as distributions. By 1991, in any event, the inaccuracy was corrected.

**36.** He computed this amount by taking the 5 prior years cash flow of $100,000 per year and applying a 15% return on investment.

**37.** On rebuttal the Debtor modified his earlier valuation from $40,000 to $24,800, by deducting income taxes a buyer would have to pay on the distributions. The Debtor also testified that if income taxes were deducted from the value Chudacoff estimated a third party would pay for the interest, that the value would be $49,600.

**38.** For reasons not known to this Court, Ms Warmus testified that a right of first refusal enhances the marketability of an asset. We disagree.

For all these reasons, the Court finds that the value of SCM was $50,000.

### 4. Value of Properties Transferred Compared to Consideration Paid.

The evidence established that David Spatz paid $1.1 million for the entities listed in the Sale Agreement. That transfer, with the exception of SCM, was made in January 1990, on or about the date of the Sale Agreement.

There was a significant amount of evidence concerning the transfer of SCM. David testified that he gave it back because it had no value. There is no documentation of the transfer of SCM back to the Debtor or to Wendy. However based upon the corporate books and tax returns it is clear that Wendy ended up owning the 50% interest in SCM and began receiving distributions in 1990. Based upon that evidence this Court concludes that David never received the interest in SCM. The uncertainty over the transfer of SCM does not, however, adversely affect David. To the contrary, because the Debtor received more than the value of the entities sold to David, the creditors were in a better position after the sale than before.

This Court finds that the total value of the properties sold to David, as of Jan 1990, the date of the transfer, was approximately $235,000. That is considerably less than the $1.1 million paid by David. Accordingly, the court finds that David paid full value for the transfers.

However, the Court further finds that Wendy paid no consideration for the SCM stock, an asset worth $50,000 at the time of the transfer.

### CONCLUSIONS OF LAW

■ The Trustee seeks to avoid the transfers described above under the fraudulent conveyance provisions of § 548 and the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1, et seq. ("UFTA").[39] Both statutes recognize fraud in fact and fraud in law. Compare § 548(a)(1) to 740 ILCS 160/5(a)(1) for fraud in fact provisions and § 548(a)(2) to 740 ILCS 160/6(a) for constructive fraud or fraud in law provisions. See also In re Randy, 189 B.R. 425, 443 (Bankr.N.D.Ill.1995) (statutes are analogous; therefore findings apply identically to UFTA and Bankruptcy Code.)[40]

■ Fraud in fact occurs when the debtor transfers property with the intent to hinder, delay or defraud his creditors. Constructive fraud, or fraud in law, occurs when the debtor, regardless of intent, does not receive "reasonably equivalent value" for the transfer and was insolvent at the time or became insolvent as a result of the transfer.[41]

---

**39.** The Trustee is authorized by § 544 to assert the rights of creditors under state law in this bankruptcy case. In a pre-trial ruling, this Court concluded that the UFTA is the governing law and should be retroactively applied to the transfers. Although this conclusion is contrary to that reached by other bankruptcy courts, those decisions were made without the benefit of three Illinois Appellate court decisions. See U.S. v. Hatfield, 1996 WL 153686 at *4 (N.D.Ill.1996); In re Lyons, 130 B.R. 272, 278 (Bankr.N.D.Ill. 1991); In re Aluminum Mills Corp., 132 B.R. 869 (Bankr.N.D.Ill.1991). The Illinois courts that have addressed this issue have consistently applied the 1990 law retroactively. See Regan v. Ivanelli, 246 Ill.App.3d 798, 187 Ill.Dec. 351, 617 N.E.2d 808 (1993); Cannon v. Whitman Corp., 212 Ill.App.3d 79, 155 Ill.Dec. 503, 569 N.E.2d 1114 (5th Dist.1991); Farm Credit Bank of St. Louis v. Lynn, 204 Ill.App.3d 538, 149 Ill.Dec. 659, 561 N.E.2d 1355 (3d Dist.1990). Where an issue is one of state law and the highest state court has not addressed the issue, federal courts should treat decisions by the intermediate courts as authoritative, unless those decisions are in conflict or clearly wrong. Rekhi v. Wildwood

Indus., Inc., 61 F.3d 1313, 1318 (7th Cir.1995). Neither of those two conditions are present here: the intermediate courts reached the same conclusion and there is nothing indicating that conclusion was erroneous. In any event, the result would be the same under either the UFTA or its predecessor statute. Scholes v. Lehmann, 56 F.3d 750, 756 (7th Cir.1995).

**40.** An important difference between § 548 and UFTA is that § 548 authorizes avoidance only of transfers made within one year before bankruptcy. Otherwise, for purposes of this case, the statutes may be regarded as nearly identical. Since this Court has found that all the transfers were made more than a year before bankruptcy, relief under § 548 could be denied for that reason alone.

**41.** Under § 548(a)(2) constructive fraud may also be established by showing, in lieu of insolvency, that the debtor retained "unreasonably small capital" or had debts beyond the debtor's ability to pay. These provisions are not in UFTA, nor are they at issue here.

The Defendants contend that all of the challenged transfers were for full commensurate value and therefor the transfers are not avoidable as either fraud in law or fraud in fact. Obviously, full consideration is a defense to constructive fraud claims. The legal issue presented by this case is whether payment of full consideration is an absolute defense to claims of fraud in fact, regardless of the debtor's intent.

The Trustee argues that the language of the statute refutes the full consideration argument. The language the Trustee relies on is in § 9(a) of the UFTA. That section provides that a transfer is not voidable under the intentional fraud section (§ 5(a)(1)) against "a person who took in good faith and for reasonably equivalent value." The Trustee argues that the UFTA therefore requires *both* good faith *and* full consideration as a defense, not full consideration alone. But the Trustee is reading too much into that language. In fact, the UFTA suggests that full consideration at least may be a defense.

The section that defines when a transfer is fraudulent is section 5(a)(1), which provides that a transfer is fraudulent "if the *debtor* made the transfer.... with actual intent to hinder, delay, or defraud any creditor ..." The "intent" at issue under that section is the transferor/debtor's, not the transferee's. Section 9 (the one relied upon by the Trustee) does not address whether a transfer was fraudulent; it deals with a different issue—the rights and liability of a good faith transferee (i.e., "a person who took in good faith...."). The "good faith" referred to in that section is the transferee's, not the transferor/debtor's. The rights and liabilities of the transferee (good faith or otherwise) are not even at issue, however, until the transfer is found to be fraudulent under § 5.

Section 5(b) sets forth a list of factors that may be considered to determine whether the transferor acted with the requisite intent— also known as the "badges of fraud." Subsection (8) says that one of those factors is whether "the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred...." The language of § 9, therefore, is not applicable to a determination of fraud in fact under § 5. At a minimum, § 5 supports the conclusion that full consideration may be evidence that refutes any allegation of intent to defraud creditors.[42]

The Defendants, however, argue more than that full consideration is a factor that may weigh against a finding of fraudulent intent. They argue that, at least in this case, the payment of full consideration is an absolute defense, regardless of other evidence of intent. If the Debtor's estate suffered no loss, they contend, there can be no remedy. They principally rely on a Seventh Circuit opinion, *Scholes v. Lehmann*, 56 F.3d 750, 756 (7th Cir.1995), in which the court said in very strong dicta that full consideration is a defense to any fraudulent transfer claim. The debtor in *Scholes* had been operating a Ponzi scheme. The receiver brought actions under the old Illinois fraudulent conveyance statute, Ill.Rev.Stat. Ch. 59, ¶ 4, to recover transfers made to three Defendants: 1) the Debtor's ex-wife, 2) an investor in the Ponzi scheme who had made a profit, and 3) a religious organization that had received contributions. At the outset, the Seventh Circuit explained that even if a transferor made a transfer with intent to defraud, "if a transfer is made for commensurate consideration—if it is 'fair' in the sense of being one side of an equal exchange—it is not voidable. For creditors are not disturbed, delayed, hindered or defrauded if all that happens is the exchange of an existing asset of the debtor for a different asset of equal value." *Scholes* at 752.

The problem with this language is that it is dicta, because none of the defendants actually paid full consideration. The Trustee also argues that the Seventh Circuit was not discussing intentional fraud, but constructive

---

**42.** In *Scholes v. Lehmann*, 56 F.3d 750, 756 (7th Cir.1995), the court said of the predecessor to the UFTA, "The statute under which the receiver sued does not say that transfers supported by consideration are *outside its reach. It does not* have to. A transfer for full in the sense of commensurate consideration cannot (in the ordinary case, anyway) hinder, defraud, or otherwise discomfit creditors, because it is merely replacing one asset with another of equivalent value, as with revolving credit." That parenthetical phrase "(in the ordinary case)" is important, where the effect of the transfer is to hinder of delay creditors.

fraud. There were constructive fraud claims against all three defendants, but a fraud in fact claim against only one.[43] The court was chiefly concerned with the argument that a finding of constructive fraud required no consideration, not merely less than reasonably equivalent value. Moreover, at page 756 of the opinion, the court cites as an example of the law's recognition of the full consideration defense the constructive fraud provisions of the Bankruptcy Code, § 548(a)(2). Nevertheless, it is clear from the opinion as a whole that the court was referring to fraud in fact.

> For example, at page 757 the court said: If valuable consideration means full consideration, then even if there is intent to defraud there can be no harm to creditors, since the debtor's estate has not been depleted by a cent.

The court then appropriately asked: "So why is there a separate concept of fraud in fact? Why is not fraud in law both a necessary and a sufficient condition for finding a transfer fraudulent?" *Id.* It explained, at 56 F.3d at 757, that there are two reasons, the first being particularly pertinent here:

> If the plaintiff proves fraudulent intent, the burden is on the Defendant to show that the fraud was harmless because the debtor's assets were not depleted even slightly. If the plaintiff takes the indirect route of proving a lack of full consideration, the burden of proof on the issue of incommensurability of consideration, and hence of the depletion of the debtor's assets, is on him.[44]

That first sentence is a clear statement of the Seventh Circuit's opinion that a showing of commensurate consideration will defeat a fraudulent transfer claim, even if the plaintiff has proven fraudulent intent. The Trustee's

argument that *Scholes* dealt only with constructive fraud is therefore wrong.

The Trustee further contends that several Illinois cases, dating back to 1890, support his argument that full consideration is not a defense to fraud in fact. But in each of those cases the transfer did in fact "hinder, delay, or defraud creditors" for reasons unrelated to the amount of consideration, and, in any event, there was never any proof of full consideration. Those cases, therefore, support the view that the focus is on whether the creditors were actually "hindered or delayed" in collecting from the transferor, in other words, the *effect* of the transfer on creditors.

In *Beidler v. Crane*, 135 Ill. 92, 25 N.E. 655 (1890), the judgment debtor assigned patents to a friend, who then conveyed them to corporations. The assignments purported to be absolute, but the creditors contended that they were made "with the intent and for the purpose of a secret trust for the benefit of the [debtor]." The defendant denied that contention, alleging that "the sales and assignments ... of the patents were absolute, ... and that neither he nor the corporations ... held either the patents or the stock for the use or benefit of [the debtor]; and that the latter had no interest whatever in the stock of either corporation." 135 Ill. at 96, 25 N.E. 655. The defendant claimed that he released substantial debts as consideration for the assignments.

The court simply affirmed lower court findings against the defendant on these issues: "We cannot, under the evidence, hold otherwise than that [defendant is] the mere mortgagee or pledgee of such patents, and never was, and is not now, the absolute owner thereof." 135 Ill. at 98, 25 N.E. 655. The court then held that the assignments were

**43.** There was a fraud in fact claim against the debtor's ex-wife. The court noted that she may have had some valid claims against the debtor. "But if she had had claims against [the debtor] equal to the amount of money he gave her, so that by giving it to her he received consideration in the form of a release of commensurate legal obligations to her, this would be adequate and not merely nominal consideration. There would be no net depletion of the estate administered by the receiver, which is the standard of adequacy as we have been articulating it." *Id.* at 758.

Reading the opinion as a whole, it is clear that this statement means that full consideration would have been a defense to the fraud in fact claim, not only the constructive fraud claim.

**44.** The second reason is, "if the fraudulent intent is proved, then ... the Defendant, unless he had no knowledge of the transferor's fraudulent intent, must return the entire payment that he received rather than just the amount by which it exceeded the consideration that he gave in exchange for the payment." *Id.*

constructively fraudulent for the following reasons:

> A conveyance of property which is absolute upon its face, but which is really intended as a mortgage or security, is well enough as between the parties; but the settled doctrine is that such a transfer of property is fraudulent and void as to creditors. Here, the assignments of the patents were absolute in form, and were duly recorded in the patent-office, and they imported unconditional sales. Hence, their natural and necessary effect was to mislead, deceive, and defraud creditors. They were in substance and in fact the creation of secret trusts for the benefit of the assignor.... [*Id.*]

It is at this point, in the context of finding *constructive* fraud, that the court makes its first statement about full consideration.

> Even if we should assume that the transfers were for valuable and ample consideration, and were not, as matter of fact, intended to accomplish covinous and dishonest purposes, yet, as there were trusts which were not disclosed by the writings, and were therefore secret trusts, it follows that the law itself regards the transactions as lacking the element of good faith and conclusively infers fraud, and that the courts are bound so to pronounce. [Citations omitted] There is no question, then, but that the assignments were constructively fraudulent. [135 Ill. at 98, 25 N.E. 655] [45]

The court then reviewed the lower courts' refusal to allow the defendant a credit for the consideration he paid for the patents, stating: "It is without doubt the rule in equity that, where a conveyance or transfer of property is set aside solely upon the ground that it is constructively fraudulent as to creditors, it will yet be upheld to the extent of the actual consideration, and be vacated only as to the excess." 135 Ill. at 99, 25 N.E. 655. But intentional fraud, or fraud in fact, "is absolutely void as against creditors, and is not permitted to stand for any purpose of reimbursement or indemnity." *Id.* It is in this context that the court says: "Even though the grantee or assignee pays a valuable, ade-

quate, and full consideration, yet, if the grantor or assignor sells for the purpose of defeating the claims of his creditors, and such grantee or assignee knowingly assists in effectuating such fraudulent intent, or even has notice thereof, he will be regarded as a participator in the fraud; for the law never allows one man to assist in cheating another." *Id.* The court then found ample evidence that the defendant was a participant in the fraud.

The conclusion to be drawn from *Beidler* is not that the transfer was fraudulent in fact only because of the debtor's intent, but also because of its *effect:* it created a secret trust or lien that preserved the debtor's interest in at least any appreciation in value, but it deceived creditors because it was made to look as if the debtor retained no interest at all. Here, the Trustee is arguing that if the parties *intend* to commit fraud, the transaction is avoidable regardless of its *effect. Beidler* does not stand for that proposition.

Similarly in *Sherwin–Williams Co. v. Watson Indus.*, 361 Ill. 598, 603, 198 N.E. 704 (1935) the court determined that the transferee "did not agree to pay and assume an amount equivalent to the full value of the premises in question." Therefore, it is again impossible to discern whether full consideration would have been a defense to fraud in fact. Moreover, even if the transferee had paid full consideration, the transfer still had the effect of hindering and delaying creditors because it created a secret trust that enabled the transferor to retain a secret interest in the property transferred. Accordingly, contrary to the Trustee's assertion, there are no Illinois cases that hold that full consideration is not a defense to fraud in fact. In fact one of the cases cited by the Trustee supports the Defendants' contention. In *Cairo Lumber Co. v. Ladenberger*, 313 Ill.App. 1, 39 N.E.2d 596 (4th Dist.1942) the court noted that "[t]he first question to determine is whether or not the transfers from [the mother] to [the son] were made for a full and adequate consideration." The court went on to state that it is only after it has been determined that the transfer was without

---

**45.** Under modern principles, this case would probably be dealt with as fraud in fact. What is important here is only that the court was looking to the fraudulent effect of the transaction in its discussions of both varieties of fraudulent transfers.

consideration that the question of whether the transfer impaired the rights of creditors becomes relevant. Unfortunately, in that case there were only unsubstantiated allegations by the son that the transfers were made for services performed by him for his mother. Not even his mother testified in support of this allegation.

Finally, this interpretation of UFTA is consistent with the remedial theory of most civil statutes and common law causes of action, including torts, that if there is no damage then there is no cause of action.[46] The Seventh Circuit recognized this in *Scholes* when it said that a transfer for "commensurate consideration" is not voidable because creditors are not injured when assets of equal value are exchanged. *Id.* at 753.

The appropriateness of this conclusion is even more apparent when we consider the practical effect of one of the transactions challenged here. David Spatz paid the Debtor $1.1 million dollars for interests in four closely held entities. This Court has determined that the value of the interests transferred was substantially less than the amount David paid. None of those interests could have been readily liquidated on the open market; rather, as this Court found, the ownership interests would have been subject to substantial discounts for their illiquidity and lack of control. Yet, the creditors of the Debtor (through the Trustee) are complaining that their ability to collect on their debts was hindered by the transfers. It is difficult to comprehend how any creditor is hindered in its collection efforts when unmarketable interests are replaced with cash in excess of the value of those interests.

### CONCLUSION

For these reasons, the Court finds that payment of full consideration for a transfer is a defense to claims under both fraud in fact and fraud in law theories, regardless of the debtor's intent, in the absence of other facts showing that creditors were hindered, delayed or defrauded. There are no such other facts in this case. Because this Court has found that David paid more than commensurate value for the properties he received from the Debtor, judgment must be entered in his favor.

 Wendy, however, received an asset worth $50,000 from the Debtor for no consideration. That is a constructively fraudulent transfer, or fraud in law, regardless of the Debtor's intent (which was not at issue in this phase of the trial). The Trustee's complaint demanded recovery "from each initial and/or mediate transferee herein described the property transferred or, in the alternative, its value," and Wendy is identified as a transferee. Nevertheless, the Trustee has never alleged what turns out to be the fact— that Wendy received SCM in a fraudulent transfer. To the contrary, he alleged that the stock was transferred to David. But even if the pleading is deficient, F.R.Civ.Pro 54(b) (applicable here under F.R.Bankr.Pro. 7054) provides that, "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." The issue was fully tried; Wendy had every opportunity to prove any defense she might have. And there really is no dispute that she never paid any consideration.

For these reasons, judgment will be entered against Wendy for $50,000. Otherwise, Wendy paid full value for what she received, and judgment will be entered in her favor on all other claims.

An appropriate order will be entered.[47]

---

**46.** Modern fraudulent conveyance statutes developed from the Statute of Elizabeth, 13 Eliz., Ch. 5 (1570), which was a penal statute. *See In re Sverica Acquisition Corp., Inc.,* 179 B.R. 457, 469 n. 17 (Bankr.E.D.Pa.1995). However, the purpose of modern statutes is to prevent unfairness and its remedy is restitutionary. *In re Randy,* 189 B.R. 425, 444 (Bankr.N.D.Ill.1995).

**47.** This Court has been spoiled by the invaluable services of an unbroken string of excellent law clerks. Those services are seldom acknowledged outside chambers. In this case, however,

it is necessary and proper to here express appreciation to this Court's current law clerk, Lisa Ramsden Kenney, particularly because of her extraordinary efforts—at, it must be said, her own initiative and by methods of her own design—to keep us in command of the voluminous, often confusing, evidence. Because of those efforts, the decision making process was far more efficient, and less painful, than it otherwise would have been. (Needless to say, any confusion this Court has about this case is only despite Ms. Kenney's efforts.)

## JUDGMENT ORDER

Pursuant to this Court's prior Order, this adversary proceeding was tried on Counts I, II and III of the complaint, limited to issues of the value of the property transferred by the Debtor to the Defendants David Spatz and Wendy Spatz and the value of the consideration those Defendants paid for that property. On the Defendants' motion for a judgment on partial findings at the conclusion of the taking of evidence on those issues, for the reasons stated in the Memorandum Opinion of even date herewith, judgment is entered as follows:

1. The Plaintiff, Louis W. Levit, as Trustee for the bankruptcy estate of William Spatz, shall recover from the Defendant, Wendy Spatz, $50,000, and judgment is hereby so entered.

2. The Plaintiff is denied all other relief requested in the complaint with respect to the matters alleged in Counts I, II and III, and, except as stated above, judgment is entered in favor of the Defendants William Spatz, David Spatz and Wendy Spatz and against the Plaintiff.

3. The Court determines that there is no just reason for delay and directs that this Order be entered as a final judgment on Counts I, II and III of the complaint.