**In re William SPATZ, Debtor.**

**Louis W. LEVIT, Trustee of the Estate of William Spatz, Plaintiff,**

**v.**

**William SPATZ, et al., Defendants.**

No. 97 C 5684.
Adversary No. 93 A 914.

United States District Court,
N.D. Illinois,
Eastern Division.

June 17, 1998.

David N. Missner, Rudnick & Wolfe, Chicago, IL, for William Spatz.

CASTILLO, Judge.

Appellant Louis W. Levit, Trustee of the Estate of William Spatz, appeals from the bankruptcy court's ruling that the payment of full consideration is a defense to fraud in law and fraud in fact under both the Bankruptcy Code and Illinois' version of the Uniform Fraudulent Transfer Act ("UFTA")[1]. The Trustee further challenges several factual findings and evidentiary rulings entered below. Because we find that the mere payment of full consideration is not, as a matter of law, an absolute defense to fraud in fact under the UFTA, we reverse and remand.

## FACTS

An understanding of the bankruptcy proceedings requires a brief examination of the debtor's financial and business history. William Spatz conducted real estate development and management activities through various corporate and limited partnership entities. William[2] established Spatz & Co., a real estate management company, as a conduit for funds earmarked for individual real estate development projects. In 1986, William's father, David Spatz, agreed to fund several of these ventures, documenting the loan with an agreement entitled "Collateral and Assignment Agreement"[3] ("C & A"). Subsequent funding was documented by "Amendments" to the C & A.[4]

William's financial affairs reached a critical state in 1989[5], and on June 14, 1991, several creditors filed an involuntary bankruptcy petition against William under Chapter 7 of the Bankruptcy Code. An order for relief was entered on July 30, 1991, and Levit was appointed Trustee. The bankruptcy proceedings revealed that William had transferred substantial assets to his wife, Wendy Spatz, and to David just prior to bankruptcy. The genesis of this appeal can be traced to those transfers, which are set forth below:

**Transfer 1.** The first transaction actually involved two separate property transfers.

---

1. The UFTA was promulgated in 1984 by the National Conference of Commissioners on Uniform State laws and approved in 1985 by the American Bar Association. Illinois enacted the UFTA on January 1, 1990. Before adopting the UFTA, Illinois fraudulent transfer law was patterned after the Statute of Elizabeth. *See* 1 GLENN, Fraudulent Conveyances and Preferences § 60 (3d ed.1940) (citing 13 Eliz. Ch. 5 (1570)). The Statute of Elizabeth enabled creditors to pursue fraudulently transferred property and authorized criminal sanctions. Most subsequent statutory provisions and common law developments, however, authorize civil penalties only. *Id.*

2. Because the debtor and the defendants share the same last name, this Court, as did the bankruptcy court before us, will refer to these parties by their first names.

3. These transactions were actually documented by two sets of agreements. William and David offered no explanation as to why two sets of virtually identical documents were prepared. The major distinction between the two documents was that in the first set, the individual amounts loaned in connection with each entity were set forth, and the subsequent Amendments contained handwritten notations by David requesting "only total figures." Conversely, the second set of C & A documents ("C & A II") showed only totals and contained no such notation.

4. The subsequent Amendments were dated January 3, 1987, January 3, 1988, January 8, 1989, and in the case of C & A II, January 5, 1990.

5. On February 16, 1989, Heller Financial, Inc. commenced foreclosure proceedings against a shopping center owned by one of William's ventures, Park Place Associates. On April 20, 1989, Balcor Real Estate Finance, Inc. commenced enforcement proceedings in Colorado which ultimately resulted in a judgment against William for over $5 million. William's attempts to protect his properties via foreclosure and Chapter 11 bankruptcy were unsuccessful.

First, William transferred to Wendy his one-half interest in the family's Glencoe residence [6], all of his Spatz & Co. stock, and his limited partnership interests in real estate ventures known as Highland Park I and II. As consideration for these transfers, Wendy agreed to assume the obligations for a $ 3 million loan from David to Spatz & Co., and the guarantee by William. Wendy's exposure was limited to the extent that the obligations could be satisfied by proceeds from Highland Park I and II.

Wendy then pledged her interest in the Highland Park limited partnerships to David in exchange for David's agreement to release Spatz & Co. from $3 million in loans and William from the guarantee, and to return the collateral securing the obligations.

The document evidencing the transfer, the Sale and Exchange Agreement ("Exchange Agreement"), is dated January 10, 1989. However, the Glencoe deed is dated July 6, 1990, and was not recorded until July 10, 1990.

**Transfer 2.** Pursuant to an agreement dated January 1, 1990, William transferred the following assets to Wendy: i) 90% of William's general partnership interest in the Fort Wayne limited partnership; ii) 100% of his interest in the S & C Maintenance Corp.; iii) 100% of Spatz & Co. Development Corp; and iv) 100% of American Retailing Corp. The Agreement required Wendy to pay $ 25,-000 for the assets.

**Transfer 3.** On January 11, 1990, William and David executed a Purchase and Sale Agreement ("PSA"), whereby William agreed to transfer to David: i) 76% of William's limited partnership interest in Neenah Associates; ii) 76% of his limited partnership interest in Sioux Falls Associates; iii) 5% of William's general partnership interest in Meadowland; iv) 49% of a 50% ownership interest in Spatz Real Estate Management Corp. ("SMC"); and v) 44% interest in Montgomery II Associates Limited Partnership. The defendants alleged that David paid William $1.1 million in exchange for the assets. However, the bankruptcy court determined that William had transferred the SMC interest to Wendy for no consideration and ordered her to remit the fair market value.

**The Bankruptcy Action**

On July 19, 1993, the Trustee filed a complaint in the bankruptcy court alleging that the transfers violated of § 548 of the Bankruptcy Code. In addition, the Trustee challenged the transfers under the "fraud in fact" (§ 5(a)(1)) and "fraud in law" (§ 5(a)(2)) provisions of the UFTA. "Fraud in fact" occurs when a debtor makes a transfer "with the intent to hinder, delay, or defraud creditors." See 740 ILCS 160/5(a)(1). Conversely, intent is irrelevant under a "fraud in law" theory—rather, fraud is presumed if the debtor does not receive "reasonably equivalent value" for the transferred assets and was or became insolvent at the at the time of the conveyance. See 740 ILCS 160/5(a)(2).

In their pre-trial brief, defendants Wendy and David requested a ruling from the bankruptcy court 1) limiting the scope of the parties' initial presentation of evidence to the valuation of the assets transferred and the consideration received; and 2) holding that the payment of full consideration was an absolute defense to the Trustee's "fraud in fact" and "fraud in law" claims. The Trustee objected, arguing that the payment of adequate consideration would be a defense only to his "fraud in law" claim. Conversely, if William made those transfers with fraudulent intent, and Wendy and David knew or should have known that William acted with such intent, then the transfers were fraudulent regardless of the consideration given under a "fraud in fact" theory.

Siding with the defendants, the bankruptcy court limited the parties' initial presentation to evidence relevant to the amount of the consideration paid and the value of the assets transferred. Apr. 30, 1997 Order. The court delineated the parties' burdens of production, directing the defendants to produce evidence establishing their contention that they paid full consideration for the assets transferred. If the defendants failed to satisfy their burden, the Trustee would then be allowed to "put into his case in a normal

---

**6.** Levit sought to set aside the transfer of the Glencoe residence in a separate proceeding. That dispute was settled in 1992, and the Glencoe residence is not at issue in this case.

manner, including all matters of testimony and evidence not already heard and/or introduced." *Id.* at ¶ 2B. Conversely, "[i]f, at the conclusion of the defendants' opening case ... the Court shall determine that defendants' case standing alone is sufficient to carry the burden of proving a complete defense under such counts, plaintiffs shall then put in such testimony and evidence as in his opinion is relevant to overcoming that testimony and evidence; provided, however, that Plaintiff's opinion as to the *relevance* of such testimony and evidence shall be subject to the *Court's determination* ...." *Id.* at ¶ 2C (emphasis added).

**The Dates the Transfers were Executed.**

A hearing was conducted in accordance with the bankruptcy court's April 30, 1997 Order. The parties introduced conflicting evidence as to the dates that the first and the third transactions were actually executed. For example, the Trustee argued that Transfer 1 was not entered into on January 10, 1989, the date recorded on the Exchange Agreement, but rather at a later date. In support of his assertion, the Trustee relied primarily upon the testimony of Eugene Faigus, the former president of Spatz & Co. and person responsible for drafting most legal documentation for the various Spatz enterprises. Faigus testified that the Exchange Agreement was neither executed nor completed by the time he left Spatz & Co.'s employ in August 1990. Faigus also testified that he had prepared a UCC filing on January 30, 1989, showing William as the owner of the Highland Park I and II partnerships that were allegedly transferred to Wendy under the January 10, 1989 Exchange Agreement. Similarly, a financial statement prepared in May 1989 showed William still owning the Spatz & Co. stock.

In addition, while the Exchange Agreement purported to transfer William's Spatz & Co. stock to Wendy, William continued to receive Spatz & Co. distributions in excess of $ 6,000 per month until April 1990. The deed conveying William's one-half interest in

the Glencoe residence to Wendy was not executed until July 6, 1990 and was not recorded until July 10, 1990. Finally, the Trustee introduced evidence undermining William's credibility.[7]

In response, the defendants attacked Faigus' credibility. The defendants informed the court that Faigus was disgruntled after almost losing his home to support his guarantee of certain Spatz & Co. loans, because of William's failure to honor an agreement to indemnify Faigus. Contrary to his trial testimony, Faigus testified in a prior deposition that he prepared the Exchange Agreement at the end of 1989 or early 1990. Another Spatz & Co. employee testified that Faigus was preoccupied with other matters and spent little time on Spatz & Co. business during the period Faigus claims to have worked on the agreement.

As to the May 1990 financial statement, William explained that the May 1989 document tendered by the Trustee showing William as the owner of both the Spatz & Co. stock was just a draft, and that subsequent documents prepared on May 31, 1989 and December 31, 1989 did not list William as the owner of the Spatz & Co. stock. In addition, William claimed that the Glencoe deed was not executed and recorded earlier because Faigus failed to explain the legal requirements for transferring the property. Finally, the defendants introduced tax returns and financial records recognizing the income from the property transfers, even though it would have been advantageous to delay recognition of the income for another year. The court recognized that William's credibility was questionable, but found the tax returns and financial statements to be compelling evidence that Transfer 1 occurred in January 1989. *In re Spatz*, 209 B.R. 907, 912 (Bankr. N.D.Ill.1997).

As to Transfer 3, the Trustee argued that the Sale Agreement, dated January 11, 1990, was entered into, if at all, after August, 1990. The Trustee contended that the $1.1 million that David paid to William was actually a gift or an attempt to invest in another enterprise [8], and was not paid to purchase the

---

7. The bankruptcy court prevented the Trustee from presenting further evidence on this issue on the basis that it was not relevant to the valuation of the assets or the consideration transferred.

8. The Trustee argued that David transferred at least a portion of the $1.1 million to purchase the West Bank property.

listed properties. In support of his contention that the Sale Agreement was backdated, the Trustee relied solely upon Faigus's testimony that he drafted the Sale Agreement in May or June of 1990. The defendants again pointed to Faigus's prior deposition where he testified that he prepared the agreement in late 1989 or early 1990. The bankruptcy court rejected Faigus's explanation that his memory was better at the time of trial, finding Faigus to be incredible. Instead the court credited the defendants' evidence, which consisted of 1) the defendants' showing that David actually paid the $1.1 million dollars in the fall of 1989 (in a manner consistent with their prior business practices); 2) a handwritten letter dated November 29, 1989 from David asking Faigus when the agreement would be completed and requesting its prompt delivery [9]; and 3) the 1989 and 1990 tax returns for the transferred limited partnerships reflecting the transfer of William's interest in the limited partnerships to David.

**Value of the Assets Transferred**

The parties each introduced expert testimony on the value of the assets transferred. As to Transfer 1, the Trustee relied upon the testimony of Mary Warmus, a CPA with substantial experience in valuing business interests. The defendants relied upon William's testimony, and while William was not a CPA or a Member of the Appraisal Institute ("MAI"), the court found that William's overall experience in the real estate business qualified him as an expert. The court determined that Warmus' methodology in valuing the property was dubious and that Warmus had improperly valued the property as of January 1990, instead of January 1989.[10] The court concluded that it could not rely upon Warmus' report, noting that "[a]s a practical matter it is difficult to believe that anyone would pay three-quarters of a million dollars for a company that had never made a

profit, required significant capital infusions to fund operating losses and had no long term management contracts to rely on for future profitability, even if new management could reduce costs." *Spatz*, 209 B.R. at 916. The court then refused to admit Warmus' amended report valuing the assets as of 1989, which the Trustee presented at trial.

Without Warmus' testimony, the only expert evidence the court had to rely upon was William's testimony. Unlike Warmus, William used actual (as opposed to normalized) expenses, accounted for David's loans and the contingent liabilities, and recognized that the assets were almost fully depreciated. William testified that Spatz & Co.'s primary source of income was derived from contracts with SMC management, and that it was unlikely that such contracts would remain in effect if an outsider were to purchase Spatz & Co. Based upon this testimony, the court concluded that Spatz & Co. had no value as of the date of the transfer, January, 1989.

As to Transfers 2 and 3, the defendant introduced the expert testimony of William A. McCann, an experienced real estate appraiser and consultant, as well as William's testimony on the value of the property transferred. Once again, the Trustee sought to rely upon the expert opinion of Mary Warmus. The bankruptcy court found that while Warmus had experience valuing businesses, she had no expertise in valuing real estate. Therefore,

> because several of the interests transferred could only be valued by valuing the real estate owned by the partnerships, this Court concluded that Ms. Warmus was not qualified to testify as an expert of the real estate entities. Accordingly, Ms. Warmus was not permitted to testify on the values of Fort Wayne, Sioux Falls, Neenah, and Meadowlane. The Court did, however,

---

9. The Trustee questioned the authenticity of this letter, noting that it purported to be only the first of a three-page letter and that the defendants claimed they could not locate the other two pages. In addition, David's testimony on cross-examination regarding this third transaction was contrary to his testimony on direct examination. The bankruptcy court credited the discrepancy to David's age and fading memory, not an intent to deceive.

10. The court concluded that this error was of great significance because by valuing Spatz & Co. as of 1990, instead of 1989, the liability to David of more than $2 million was no longer reflected on the balance sheet, but had been discharged by the Exchange Agreement.

permit her to comment and opine on the relevance of comparable sales available for those properties. The Trustee, therefore, had no expert testimony concerning the value of Fort Wayne.

*Spatz*, 209 B.R. at 918.

The court determined that William's interest in the Fort Wayne property was worth $ 24,381, and that S & C Maintenance Corp., Spatz & Co. Development Corp., and American Retailing Corp. had no value.[11]

**David's Transfer of $1.1 million**

Finally, as to Transfer 3, the court determined that David paid William $1.1 million for 76% limited partnership interests in Neenah Associates L.P. and Sioux Falls Associates L.P.; as well as a 5% general partnership interest in Meadowlane L.P.; a 49% of a 50% ownership interest in Spatz Real Estate Management Corp ("SMC").; and a 44% interest in Montgomery II Associates Limited Partnership. The Trustee argued that the $1.1 million was actually a gift to William and that instead of selling his SMC interest to David, William had given it to Wendy.

As to the evidence concerning the nature of the transaction, the Sioux Falls and Neenah income tax returns reveal that William's interests were transferred to David. In addition, Burt Chudacoff, the other 50% owner of the SMC stock, testified that William told him that William had sold the SMC stock and the other property to his father for $1.1 million. Chudacoff further revealed that William later changed his story and admitted that he had given his interest in SMC to Wendy.

The valuation evidence demonstrated that, at the time of the hearing, Neenah and Sioux Falls were still under construction, had failed to secure tenants, and were close to being 100% financed. The court determined that the total value of the properties transferred to David was approximately $235,000.

The court valued SMC at $50,000 at the time of the transfer, even though William

had been consistently receiving distributions in excess of $80,000 per year. The evidence established that SMC was profitable because it was able to subcontract work to Spatz & Co. at a below market rate, enabling William and Chudacoff to split the excess through SMC proceeds. The evidence demonstrated that Spatz & Co. would not agree to perform the contracts for SMC at a below market rate if William were not receiving SMC profits. Accordingly, the court concluded that the risk of contract cancellations and the "sweetheart deal" with Spatz & Co. substantially reduced its value to an outside investor. However, the court also concluded that William transferred SMC to Wendy for no consideration. Accordingly, the court ordered Wendy to remit $50,000, the fair market value of SMC, to the debtor's estate.

After receiving the parties' evidence, the court addressed the Trustee's fraud in law and fraud in fact contentions. Having determined that the defendants had paid full consideration for the assets transferred (with the exception of the SMC transfer to Wendy), the court ruled that this constituted an absolute defense to the Trustee's action and entered judgement for the defendants. The Trustee appeals.

### STANDARD OF REVIEW

In reviewing the bankruptcy judge's ruling, we sit as an appellate court. We review the bankruptcy court's findings of fact for clear error. Fed.R.Bankr.P. 8013. We apply a de novo standard when reviewing the bankruptcy court's legal interpretations. *In re Birkenstock*, 87 F.3d 947, 951 (7th Cir. 1996).

### ANALYSIS

On appeal, the Trustee challenges the bankruptcy court's legal conclusion that full consideration is an absolute defense to fraud in fact, contests certain evidentiary rulings, and asks this Court to reject several factual

---

11. The Fort Wayne property was a shopping center in Fort Wayne, Indiana. SMC Maintenance Corp. was formed in the early 1980's to do maintenance for shopping centers. Warmus had valued this property at $10,000 based upon an equity balance of $9,951 shown on the balance sheets. Further investigation revealed, however, that this amount reflected accounts receivable from an unknown debtor, and therefore was valueless. The Trustee conceded that Spatz & Co. Development Corp. and American Retailing Corp. had no value.

findings as clearly erroneous. We will review each issue in turn.

## I. FRAUDULENT TRANSFERS

■ The Trustee claimed that William's transfers to Wendy and David violated both § 548 of the Bankruptcy Code and § 5 of the UFTA. Both statutes recognize fraud in fact and fraud in law. Because the provisions of the UFTA parallel § 548 of the Bankruptcy Code, findings made under the Bankruptcy Code are applicable to actions under the UFTA. *In re Randy*, 189 B.R. 425, 433 (Bankr.N.D.Ill.1995). The critical distinction between the two, for purposes of the instant case, is the statute of limitations.

### 1. Statute of Limitations

■ The bankruptcy court correctly found that the Trustee was barred from seeking relief under the federal fraudulent transfer statute. *See* 11 U.S.C. § 548. Section 548 of the Bankruptcy Code provides that a "trustee may avoid any transfer of an interest of the debtor in property . . . that was made or incurred on or within one year before the date of the filing of the petition." 11 U.S.C. § 548(a). Because the bankruptcy petition was not filed until June 14, 1991, only transfers made on or after June 14, 1990 fall within the scope of § 548's avoidance powers. The bankruptcy court found that all of the transactions in question occurred before that date, rendering the Trustee's attempt to avoid under § 548 untimely.

This is not the end of our inquiry, however, because the Trustee also alleged violations of the UFTA. The bankruptcy court ruled that all of the transfers were beyond the reach of the preference provision of the UFTA. However, we find that the Trustee's action is timely under § 5 of the UFTA, pursuant to the Bankruptcy Code's strong arm provision.

The Seventh Circuit has held that "[u]nder the strong-arm provision of the Bankruptcy Code, 11 U.S.C. § 544(b), the trustee can avoid any transaction of the debtor that would be voidable by any unsecured creditor under state law. . . . The trustee need not identify the creditor, so long as the creditor exists." *In re Image Worldwide, Ltd.*, 139 F.3d 574 (7th Cir.1998) (citations omitted).

In determining whether an action is timely under § 544(b), we look to § 546 of the Bankruptcy Code. Pursuant to § 546 of the Bankruptcy Code, the Trustee may bring a state law action under the Bankruptcy Code's strong arm provision within two years after his appointment. Section 546 provides that:

> (a) An action or proceeding under section 544 . . . of this title may not be commenced after the earlier of—
>
> (1) two years after the appointment of a trustee under section 702, 1104, 1163, 1302, or 1202 of this title; or
>
> (2) the time the case is closed or dismissed.

11 U.S.C. § 546(a).

However, section 544(b) specifically contemplates that the action will be brought pursuant to state law. The relevant state law, the UFTA, has its own limitations provision. The UFTA provides that the Trustee can bring a fraudulent transfer action within the later of four years after the transfer was made or within one year after the transfer was or reasonably could have been discovered. 740 ILCS 160/10.

In determining the appropriate statute of limitations for UFTA actions brought under § 544(b) of the Bankruptcy Code, courts have reconciled the seemingly conflicting limitations periods by applying a two part test. The bankruptcy court *In re Martin* neatly summarized the process:

> The applicable *state* statute of limitations is only relevant to the first part of the test, which requires the action to be maintainable under the state statute of limitations as of the commencement of the bankruptcy proceeding. Once the bankruptcy petition is filed, 11 U.S.C. § 546 governs the time for bringing the action, and it requires the action be brought within the earlier of two years after the trustee is appointed or before the close of the bankruptcy proceeding. Under this analysis, it is immaterial if the limitations period accrues during the pendency of the bankruptcy case.

*In re Martin*, 142 B.R. 260, 265 (Bankr. N.D.Ill.1992).[12] *See also In re Gerardo Leasing, Inc.*, 173 B.R. 379 (Bankr.N.D.Ill. 1994); *In re Topcor, Inc.*, 132 B.R. 119 (Bankr.N.D.Tex.1991) (stating that the state limitations period is relevant only in analyzing whether the claim was barred prior to the bankruptcy filing); *In re Dry Wall Supply, Inc.*, 111 B.R. 933 (D.Colo.1990) (same).

■ Applying this test to the instant case, we must first determine whether the Trustee could have brought a timely action under the UFTA at the time the bankruptcy petition was filed. The bankruptcy court determined that Transfer 1 (the earliest transaction that the Trustee seeks to avoid) occurred in January 1989. The bankruptcy petition was filed on June 14, 1991. Applying the UFTA's four year statute of limitations, we find that all of the transactions were potentially voidable at the time the bankruptcy petition was filed. Turning to the second part of the test, we note that the Trustee was appointed on July 30, 1991, and filed this suit on July 19, 1993— narrowly satisfying § 546's two year limitations period. Accordingly, the Trustee's action to avoid William's transfers dating back to January of 1989 was timely.[13]

## 2. The Illinois Uniform Fraudulent Transfer Act

Having determined that the Trustee's action is timely under § 5 of the UFTA only,

we begin our substantive analysis with an examination of the bankruptcy court's ruling. In the proceedings below, the bankruptcy court found that defendants paid full consideration for the assets transferred. The court then determined that this was an absolute defense to both fraud in fact and fraud in law. The bankruptcy court stated, and both parties concede, that "[o]bviously full consideration is a defense to constructive fraud [fraud in law] claims. The legal issue presented by this case is whether payment of full consideration is an absolute defense to claims of fraud in fact, regardless of the debtor's intent." *In re Spatz*, 209 B.R. 907, 927 (Bankr.N.D.Ill.1997).

Arguing that it is not, the Trustee directed the bankruptcy court's attention to § 9(a) of the UFTA, which requires defendants to prove both *good faith* and *full consideration* to establish an affirmative defense to fraud in fact. 740 ILCS § 160/9. The bankruptcy court disagreed, finding that only § 5, not § 9, of the UFTA was relevant to the court's inquiry. The Trustee then cited numerous Illinois cases, dating back to 1890, in support of his argument that full consideration is not an absolute defense to fraud in fact. The bankruptcy court distinguished the Trustee's cases, stating that:

> in each of those cases the transfer did in fact "hinder, delay, or defraud creditors" for reasons unrelated to the amount of

**12.** The *Martin* court rejected *In re Josefik*, 72 B.R. 393 (Bankr.N.D.Ill.1987), which held that when the bankruptcy court is applying state substantive law (such as the UFTA), only the state statute of limitations should apply. The *Martin* court noted that *Josefik* improperly relied upon the Seventh Circuit's holding in *Suslick v. Rothschild Secur. Corp.*, 741 F.2d 1000 (7th Cir.1984) (holding that in the absence of a federal statute of limitations, the relevant state statute of limitations applies). However *Suslick* involved the Securities Act of 1933 and § 10 of the Securities and Exchange Act of 1934–neither of which contain a specified statute of limitations. Conversely, the Bankruptcy Code does provide a limitations period in § 546. Accordingly, the *Suslick* rule does not apply, and *Josefik's* reliance upon *Suslick* as a basis for its holding was erroneous.

**13.** Shortly after Illinois adopted the UFTA, the Illinois Institute for Continuing Legal Education published Professor Steven Resnicoff's article entitled "Fraudulent Transfers", which illustrates

how these various statutes of limitation work together. Steven Resnicoff, *Fraudulent Transfers*, IL–CLE 8–1 (1993). Resnicoff explains that

> it is possible to bring an avoidance action under § 544(b) *even if the state statute of limitations has elapsed as long as it elapsed after the filing of the bankruptcy petition.* Assume, for example, that (1) the statute of limitations under the applicable state's UFTA is six years; (b) a transfer fraudulent under such UFTA occurred on January 1, 1987; (c) the debtor filed a Chapter 11 bankruptcy petition on December 30, 1992; and (d) the bankruptcy trustee was appointed for the debtor on June 30, 1993. Because the state statute of limitations had not yet expired when the bankruptcy petition was filed, the first time limit under the Code was met. Consequently, the trustee could file an avoidance action under Code § 546 until the earlier of a[sic] (a) two years after his appointment or (b) the closing or dismissal of the bankruptcy case.

*Id.* at 41 (emphasis added).

consideration, and in any event there was never any proof of full consideration. Those cases, therefore, support the view that the focus is on whether the creditors were actually "hindered or delayed" in collecting from the transferor, in other words, the effect of the transfer on creditors.

*Spatz*, 209 B.R. at 928.

The defendants argued that if William received full consideration, then his estate suffered no damage and there can be no remedy. The defendants relied upon "very strong dicta" from the Seventh Circuit's decision in *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995) in support of this proposition. *Spatz*, 209 B.R. at 927. In *Scholes*, the receiver for corporations owned by a Ponzi scheme principal brought fraudulent transfer actions against the principal's former spouse, one of the Ponzi scheme investors, and religious organizations that received funds from the corporations. The court determined that, as a matter of law, neither the Ponzi scheme investor nor the religious organizations paid valuable consideration for the property transferred by the corporations. While analyzing the receiver's claims under his fraud in law theory, Judge Posner discussed the distinction between fraud in law and fraud in fact:

> If [the receiver] does prove fraudulent intent, however, and thus 'fraud in fact', then explicitly under the new statute as implicitly under the old the transfer is deemed fraudulent even if it is in exchange for 'valuable' consideration. There almost certainly was intent to defraud here on the part of [the principal] and through him the corporations, **but it is not the basis on which the receiver defends the judgment** he obtained in the district court, except with regard to the ex-wife, of which more later. If valuable consideration means full consideration, then even if there is intent to defraud there can be no harm to creditors, since the debtor's estate has not been depleted by a cent. So why is there a separate concept of fraud in fact? ...

There are two answers. The first is evidentiary. If the plaintiff proves fraudulent intent, the burden is on the defendant to show that the fraud was harmless because the debtor's assets were not depleted even slightly.... Second, if fraudulent intent is proved, then ... the defendant ... must return the entire payment he received rather than just the amount by which it exceeded the consideration ....

*Scholes*, 56 F.3d at 757 (emphasis added).

Siding with the defendants, the bankruptcy court acknowledged that "[t]he problem with [the *Scholes* ] language is that **it is dicta**, because none of the defendants actually paid full consideration." *Spatz*, 209 B.R. at 927 (emphasis added). Despite this, the bankruptcy court determined that the *Scholes'* court's statement that the defendants' fraud in fact burden is merely to prove that the fraud was harmless evidenced "a clear statement of the Seventh Circuit's opinion that a showing of commensurate consideration will defeat a fraudulent transfer claim, even if the plaintiff has proven fraudulent intent." *Spatz*, 209 B.R. at 928. In applying this conclusion to the Spatz transfers, the bankruptcy court stated that:

> The appropriateness of this conclusion is even more apparent when we consider the practical effect of one of the transactions challenged here. David Spatz paid the Debtor $1.1 million for interests in four closely held entities.... It is difficult to comprehend how any creditor is hindered in its collection efforts when unmarketable interests are replaced with cash in excess of the value of those interests.

*Id.* at 930.

We find that the bankruptcy court's attempt to expand the *Scholes* holding to the instant case was erroneous. Both of the parties and the bankruptcy court acknowledge that Judge Posner's statements regarding fraud in fact—made while ruling upon the receiver's fraud in law claim—were pure dicta.[14] Reliance upon dicta for guidance,

---

14. In addition, the *Scholes* court appears to contradict itself by acknowledging that "if [a plaintiff] does prove fraudulent intent, however, and thus 'fraud in fact', then explicitly under the new statute as implicitly under the old the transfer is deemed fraudulent **even if it is in exchange for 'valuable' consideration**," *Id.* at 757 (emphasis added). And, while addressing the receiver's fraud in fact claim against the principal's ex-wife, Judge Posner acknowledged "[i]nadequacy

however, does not compel reversal. Reversal is required because the bankruptcy court's ruling and interpretation of *Scholes* runs contrary to the express language and scheme of the UFTA, as well as the numerous state and federal decisions interpreting it.

### a. Statutory Interpretation

█ We first look to the language of the statute in determining whether full consideration is an absolute defense to fraud in fact. *See Reves v. Ernst & Young,* 507 U.S. 170, 177, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993); *United States v. Ranum,* 96 F.3d 1020, 1029 (7th Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 773, 136 L.Ed.2d 718 (1997). "If the statutory language is unambiguous, in the absence of a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive." *Reves,* 507 U.S. at 177, 113 S.Ct. 1163 (citations and internal quotations omitted).

Section 5 of the UFTA provides that:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

   (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; *or*

   (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation; and the debtor:

      (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

      (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

(b) In determining actual intent under paragraph (1) of subsection (a), consideration may be given, among other factors, to whether:

   (1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the **value of the consideration** received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a leinor who transferred the assets to an insider of the debtor.

740 ILCS § 160/5 (emphasis added).

█ The plain language of § 5(a)(1) requires only evidence of fraudulent intent to trigger recovery. To find that inadequate consideration is an element of fraud in fact would require us to read an additional element into the provision. Such a course of action is inappropriate as both the Seventh Circuit and the Illinois Supreme Court have directed that "courts should not insert words into legislative enactments when the statute otherwise presents a cogent and justifiable legislative scheme." *Id.* (quoting *Hayes v. Mercy Hosp. & Med. Ct.,* 136 Ill.2d 450, 456, 145 Ill.Dec. 894, 557 N.E.2d 873, 875 (1990)); *see also Hinkle v. Henderson,* 85 F.3d 298, 304 (7th Cir.1996) (unambiguous statutes given their "plain and ordinary meaning"). This is particularly true in the instant case, as the UFTA unambiguously defines the role inade-

of consideration is not an element of fraud in    fact". *Id.* at 759.

quate consideration plays in both fraud in fact and fraud in law actions.

■ In determining whether fraudulent intent exists under § 5(a)(1), the UFTA directs courts to consider eleven factors, referred to as "badges of fraud". While the adequacy "of the consideration received by the debtor" is one of the eleven badges of fraud enumerated in the statute—the eighth, to be exact—no one factor is dispositive to a finding of fraud. *See Frank IX & Sons, Inc. v. Phillipp Indus., Inc.,* 1997 WL 534509, at *8 (N.D.Ill. Aug. 25, 1997) ("section 5(b)'s list of 'badges of fraud' is not all-inclusive, and the court may also consider other evidence"); *Falcon v. Thomas,* 258 Ill.App.3d 900, 911 629 N.E.2d 789, 796 (4th Dist.1994) (same); *Alan Drey Co. v. Generation, Inc.,* 22 Ill. App.3d 611, 618, 317 N.E.2d 673, 679 (Ill. App.1974) ("[t]hese indicia or 'badges of fraud' are not conclusive of fraud, but merely afford a basis from which its existence may be properly inferred.") The defendants cannot explain why, if the drafters intended that full consideration should operate to negate fraudulent intent under the fraud in fact provision, they chose to include inadequate consideration as only one of eleven factors weighed in determining intent. *See Henderson,* 85 F.3d at 304 (finding that defendant's statutory interpretation ignored the "specific and clear" language and the scheme of the statute).

More importantly, if the drafters wanted the payment of full consideration to operate as an absolute defense to fraud in fact, they could have easily done so. Indeed, in the very next paragraph of the UFTA, the drafters made full consideration an absolute defense to fraud in law by requiring the plaintiff to prove that "the debtor made the transferor incurred the obligation ... without receiving 'reasonably equivalent value'" under § 5(a)(2). The legislature could have easily incorporated this convention into § 5(a)(1), but chose not to do so. *See United States v. Hayward,* 6 F.3d 1241, 1246 (7th Cir.1993) (refusing to insert statutory language that Congress "could have easily inserted" but "chose not to do so"). This speaks volumes about the different roles the drafters envisioned consideration playing in

the fraud in fact and fraud in fact actions under the UFTA.

■ Finally, the defendants' reading of § 5 is at odds with the general structure of the UFTA's fraudulent transfer provisions. *See Hayward,* 6 F.3d at 1246 ("[a]long with looking at the language of the statute section in question, part of a court's analysis includes examining the language and design of the statute as a whole"). Section 5 explains that fraud in fact hinges upon a debtor's intent, and then details the "badges of fraud" useful in determining intent. Once a plaintiff has established fraudulent intent, the only defense to fraud in fact is set forth in § 9 of the UFTA. Section 9 of the UFTA provides:

> (a) a transfer or obligation is not voidable under paragraph (1) of subsection (a) of Section 5 against a person who took in *good faith* and for a *reasonably equivalent value* or against any subsequent transferee or obligee.

740 ILCS § 160/9(a) (emphasis added).

Federal courts have recognized that a defense under § 9 of the UFTA consists of two elements: reasonably equivalent value and good faith. *See In re Thomason,* 202 B.R. 768 (Bankr.D.Colo.1996); *In re Randy,* 189 B.R. 425, 444 (Bankr.N.D.Ill.1995) (requiring both good faith and reasonably equivalent value under § 9's parallel provision in the Bankruptcy Code); *In re Minnesota Utility Contracting,* 110 B.R. 414 (D.Minn.1990). Similarly, Illinois courts have consistently held that only good faith and fair consideration are a defense to fraud in fact. *See, e.g., Kennedy v. Four Boys Labor Service, Inc.,* 279 Ill.App.3d 361, 216 Ill.Dec. 160, 664 N.E.2d 1088 (2nd Dist.1996). Even prior to the adoption of the UFTA, Illinois protected transferees who took in good faith and gave fair consideration from a conveyance made with fraudulent intent. *See Alan Drey Co., Inc. v. Generation, Inc.,* 22 Ill.App.3d 611, 317 N.E.2d 673 (1st Dist.1974) (purchaser who gives valuable consideration without notice of the fraud is protected from a fraud in fact finding). The Illinois Supreme Court recognized this rule as early the eighteen hundreds. *See Jewett v. Cook,* 81 Ill. 260 (1876) (finding that if a purchaser had notice of the grantor's fraudulent intent *or* if he

purchased the property at a grossly inadequate price without notice, his title will not be protected against creditors).

If we were to reject these cases and instead accept the defendants' position that the payment of full consideration was an absolute defense to fraud in fact, not only would the "good faith" element of § 9 be superfluous, but there would be no need for the legislature to have drafted § 9 at all. *Ranum*, 96 F.3d at 1030 (rejecting the defendant's statutory interpretation because it would require the court to conclude that other parts of the statute were "redundant and unnecessary.") Such a result renders the defendants' position untenable. *Hinkle*, 85 F.3d at 304 (refusing to accept defendant's interpretation, as it failed to account for how the provision interacted with other provisions).

■ In summary, the clear and unambiguous language of § 5(a)(1) directs that only fraudulent intent triggers liability under a fraud in fact theory. While *inadequate* consideration is one "badge of fraud" to be considered in analyzing intent, the inclusion of ten other factors undermines the defendants' contention that the reverse must also be true—that is, that *adequate* consideration negates any other evidence of fraudulent intent. More damaging to the defendants' position is the fact that the UFTA expressly provided a defense to fraud in fact, but requires that the transferee take both "in good faith and for reasonably equivalent value." 740 ILCS 160/9. The defendants have failed to direct us, and we have not discovered, any legislative intent requiring a contrary conclusion.[15] Accordingly, under the plain language of the UFTA, we can only conclude that full consideration is not, as a matter of law, an absolute defense to fraud in fact.

### b. Cases Interpreting the UFTA and their Application to the Spatz Transfers

The Trustee's assertion that conveyances made with fraudulent intent are actionable even if the transferee gave valuable consideration finds strong support in Illinois state decisions (*T.J. Gendron v. Chicago and North Western Transp. Co.*, 139 Ill.2d 422, 436, 151 Ill.Dec. 545, 564 N.E.2d 1207, 1214–1215 (1990) (the Illinois Supreme Court quoted its earlier ruling that "[t]here must be evidence to show a fraudulent intent before a conveyance made upon a valuable consideration may be held fraudulent."); *In re Liquidation of MedCare HMO*, 294 Ill.App.3d 42, 52, 228 Ill.Dec. 502, 689 N.E.2d 374, 381 (1997) ("[i]n fraud in fact cases, since actual consideration has been given for the transfer, a specific intent to defraud must be alleged and proved.")), federal district court caselaw (*Frank IX & Sons, Inc. v. Phillipp Indus., Inc.*, 1997 WL 534509, at *7 (N.D.Ill. Aug. 25, 1997) (Judge Coar finds that even if "the transfer of property was made for valuable consideration, [the debtor's] actions were fraudulent in fact because the transfers were made to 'hinder, delay, or defraud' a creditor."); *United States v. Kitsos*, 770 F.Supp. 1230, 1235 (N.D.Ill.1991) (Judge Shadur quotes the Illinois Supreme Court's ruling that "[t]here must be evidence to show a fraudulent intent before a conveyance made upon valuable consideration may be held fraudulent.")), and federal bankruptcy caselaw, *In re Gillissie*, 215 B.R. 370, 375 (Bankr. N.D.Ill.1997) ("[t]he distinction between 'fraud in fact' and 'fraud in law' cases is derived from whether or not there was any consideration for the conveyance under attack.").

The bankruptcy court reviewed the cases cited by the Trustee, but concluded that unlike those cases, there was simply no damage to the creditors in the instant case.[16] How-

---

15. The bankruptcy court noted that while modern fraudulent conveyance statutes derived from the Statute of Elizabeth, 13 Eliz. Ch. 5 (1570), which was penal in nature, the modern statutes are purely restitutionary. *Spatz*, 209 B.R. at 930, n. 46. We disagree. While the modern fraudulent conveyance statutes are not, like their English predecessor, criminal statutes, recovery under the fraud in fact provision of the UFTA is not purely restitutionary. To the contrary, transferees

deemed to have participated in the fraud (unable to establish both good faith and full consideration) not only must return the property transferred, but must also forfeit whatever amount of consideration was paid.

16. This conclusion fails to account for the fact that the transfers allowed the debtor to convert his assets into cash. *See Alan Drey Co. v. Generation, Inc.*, 22 Ill.App.3d 611, 619, 317 N.E.2d

ever, even if we were to accept the bankruptcy court's interpretaton of these cases, the bankruptcy court's pretrial ruling prevented the Trustee from introducing such evidence. The court's April 30, 1997 order limited the evidence presented to that relating to the value of the assets transferred and the consideration given. *See* Fed.R.Civ.P. 52(c) [17] (enabling a judge to enter judgment of partial findings once "a party has been *fully* heard on an issue."); Advisory Committee's Note (1991 Amendment) (stating that a judgment on partial findings may be made after the court has heard *all* of the evidence bearing on the crucial issue of fact).

Moreover, we cannot conclude that the bankruptcy court's rulings were harmless because the evidence that the Trustee was allowed to introduce tended to show that William intended to and did indeed hinder and delay his creditors. For example, in valuing the SMC stock, the court properly determined the fair market value. The bankruptcy court noted that while William was receiving substantial proceeds from his SMC interests those proceeds stemmed from sweetheart deals that would cease to exist if an outsider were to purchase the stock. The court adjusted the fair market value of the interests downward to account for the lapse of the sweetheart agreements, and the court determined that the transferees were liable for only that amount. So, how can creditors be damaged if William received fair market value for these assets? Easily, when the assets are transferred to his wife, Wendy. While Wendy technically owned the stock, William retained control of the enterprise. With the sweetheart deals still in effect, Wendy received over $338,000 in distributions from SMC, money that would have otherwise gone to William, possibly for the benefit of William's creditors. Instead, William was able to shelter well over one quarter of one million dollars from his creditors

by transferring the SMC stock to Wendy at a cost of only $50,000.[18]

Therefore, we must reverse the bankruptcy court's ruling. On remand, the bankruptcy court is directed to allow the Trustee to present evidence of William's fraudulent intent pursuant to the eleven statutory factors set forth in § 5 of the UFTA. If the bankruptcy court determines that the evidence fails to establish fraudulent intent, a finding for defendants is then appropriate. However, if the "badges of fraud" are present in a sufficient number, then the defendants bear the burden of establishing that they paid full consideration for the assets transferred and that they entered into the transaction in good faith. In the absence of such a showing, the transfers are voidable, and Wendy and David must return the transferred assets and forfeit the consideration given.

## II. THE BANKRUPTCY COURT'S EVIDENTIARY RULINGS

██ The Trustee attempts to persuade this Court to apply a *de novo* standard of review to a number of the bankruptcy court's findings by characterizing them as the application of "incorrect legal standards." The Trustee asserts that the bankruptcy court applied incorrect legal standards when it: 1) disregarded the valuations that the defendants had previously placed upon the transferred assets; 2) treated David Spatz' loans to Spatz & Co. as valid deductions from the value of the Spatz & Co. stock; and 3) refused to admit Warmus' expert testimony. However, the bankruptcy court did not disregard the valuations William had previously placed upon the transferred assets. The court examined the prior financial statements, but afforded them little weight in light of other conflicting evidence of value and William's explanation that these were

---

673, 680 (1974) (finding fraud where the debtor converted substantial assets into cash "which could be more easily placed beyond the reach of creditors.").

**17.** Federal Rule of Civil Procedure 52(c) is made applicable to adversary proceedings in bankruptcy by Bankruptcy Rule 7052.

**18.** The bankruptcy court and the defendants contend that it would be unreasonable for an outside investor pay more than $ 50,000 for SMC in light of the sweetheart deal with Chudacoff and Spatz & Co. However, it would be equally unreasonable for William to sell his SMC interest to an outside investor for $ 50,000 in light of the fact that William was receiving $ 80,000 from SMC annually.

merely optimistic projections of value. Similarly, whether the funds David channeled to Spatz & Co. were a gift or a loan is not a legal question subject to *de novo* review, but a question of fact.[19] The defendants presented sufficient evidence that the money was a loan, not a gift, to prevent us from ruling that the bankruptcy court's ruling was clear error.

Next, the Trustee challenges the bankruptcy court's refusal to admit Warmus' expert testimony as to the value of real estate because "Ms. Warmus is a CPA with experience valuing businesses, but not real estate. Because several of the interests transferred by William could only be valued by valuing the real estate owned by the partnerships, this Court concluded that Ms. Warmus was not qualified to testify as an expert on the real estate entities." *Spatz*, 209 B.R. at 918.

The Trustee points to Rule 702 of the Federal Rules of Evidence in support of his contention that the bankruptcy court should have admitted Warmus' testimony. Rule 702 provides that:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise.

The Trustee essentially argues that the rule must be construed in favor of admissibility, contending that courts have construed Rule 702 liberally, excluding "an expert opinion only if it is so fundamentally unsupported that it cannot help the fact finder." *Fox v. Dannenberg*, 906 F.2d 1253, 1256 (8th Cir.

1990); 4 WEINSTEIN'S FEDERAL EVIDENCE ch. 702 (1997).[20]

The Trustee overstates his position. The Supreme Court has ruled that abuse of discretion is the proper standard of review of a lower court's decision to admit or reject expert testimony. *General Elec. Co. v. Joiner*, ─── U.S. ───, ───, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997). Similarly, the Seventh Circuit has held that "[t]he decision whether to admit evidence is a matter 'peculiarly within the competence of the trial court and will not be reversed absent a clear abuse of discretion.'" *Simplex, Inc. v. Diversified Energy Sys., Inc.*, 847 F.2d 1290, 1293 (7th Cir.1988).

█ In the instant case, the record demonstrates that Warmus had extensive training, education, and experience in valuating businesses. The bankruptcy court clearly agreed with this, but found her real estate valuation background lacking. On appeal, the Trustee notes that Warmus has conducted over 130 business interest valuations since 1989, of which approximately one-third involved primarily real estate. Warmus is a member of the Business Valuation Association and the American Society of Appraisers. In addition, Warmus utilized substantially the same method that the defendants' expert, William McCann, used for valuating the property in question.

The defendants counter that Warmus conceded at her deposition that she was valuing almost exclusively real estate in determining the fair market value of the Transfer 3 properties. And while Warmus claimed that one-third of the approximately 130 business valuations she had performed involved predomi-

---

**19.** The Trustee cites *Falcon v. Thomas*, 258 Ill. App.3d 900, 196 Ill.Dec. 244, 629 N.E.2d 789 (4th Dist.1994) in support of his contention that the bankruptcy court used an incorrect legal standard in treating David's loans as gifts. *Falcon* holds that "where the challenged transaction involves an immediate family member as a preferred creditor, defendant has the burden of showing ... a valid and subsisting order which would be enforced and payment for which would be exacted regardless of the debtor's fortune or misfortune." *Id.* at 910, 196 Ill.Dec. 244, 629 N.E.2d at 796. The *Falcon* court considered the evidence in light of the relationship between the debtor and the transferees—just as the bankrupt-

cy court in the instant case did. Moreover, the bankruptcy court cited *Falcon* for the proposition that "where transfers to family members are involved, a closer scrutiny is applied" (*Spatz*, 209 B.R. at 910, n. 3), but found that, unlike the *Falcon* defendants, David had satisfied his burden.

**20.** While the Trustee also cites *Buscaglia v. United States*, 25 F.3d 530, 534 (7th Cir.1994), we find that *Buscaglia* is not controlling in the instant case, where the bankruptcy judge excluded the testimony based upon lack of expertise, and not fear of undue prejudice.

nantly real estate, she admitted that in 3 out of 4 instances she had obtained the valuation for the real estate involved from a real estate appraiser. Moreover, the real estate involved was predominantly farm land or industrial property. Warmus admitted that she had never valued a strip shopping mall before, or independently determined a capitalization rate for a shopping center.

We find that the bankruptcy court conducted an extensive *voir dire* examination of Ms. Warmus' qualifications prior to disqualifying her expert testimony. In light of Ms. Warmus' lack of training, experience, and education in the real estate appraisal field, we cannot conclude that the trial court abused its discretion in finding that she was not qualified to give expert testimony in this area.

Finally, the Trustee challenges several of the bankruptcy judge's evidentiary rulings, without citation to authority.[21] Specifically, the Trustee claims that the bankruptcy court erred by 1) unduly restricting the Trustee's examination into William's credibility; 2) the admission of the first of a three page letter written in 1989; 3) the admission of unsigned drafts of the PSA which were not offered until trial; 4) the admission of William's critique of Warmus' report which was not offered until trial; 5) the refusal to admit Warmus' amended report valuing the Transfer 1 properties as of 1989; and 6) the disparate treatment given the plaintiff and the defense on issues of admissibility.

■ As to his first challenge, the Trustee will have a full opportunity to examine William's credibility during the "intent" phase of the proceedings on remand. We have reviewed the remaining challenges, and, were we the trying court in this case, we might have ruled in favor of the Trustee on some of the evidentiary issues raised. However, this Court is not in a position to reweigh the evidence or substitute our judgment for that

of the bankruptcy court. *Dugan v. United States*, 18 F.3d 460, 463 (7th Cir.1994). And the Trustee has failed to establish that "no reasonable person could agree with the [bankruptcy] court." *Gagan v. American Cablevision, Inc.*, 77 F.3d 951, 966 (7th Cir. 1996) (quoting *Mares v. Busby*, 34 F.3d 533, 535 (7th Cir.1994)). Therefore, we affirm the bankruptcy court's evidentiary rulings.

## III. BANKRUPTCY COURT'S FACTUAL FINDINGS

The Trustee challenges as clearly erroneous the bankruptcy court's credibility determinations; valuation of SCM at only $ 50,-000; conclusion that David paid $1.1 million for the Neenah–Sioux Falls group of properties; and finding that neither the PSA nor the Exchange agreements were back dated.

■ The Trustee argues we should reverse the bankruptcy judge's ruling to the extent that he awarded any weight to William's testimony and disregarded Faigus' testimony. Initially we note that reviewing courts afford great deference to a trial judge's credibility determinations. The Seventh Circuit has observed that:

> The trial court ... has 'the best opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject[s]' reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements, as well as confused and nervous speech patterns in contrast with merely looking at the cold pages of an appellate record.

*United States v. Duarte*, 1 F.3d 644, 651 (7th Cir.1993), *cert. denied*, 510 U.S. 1058, 114 S.Ct. 724, 126 L.Ed.2d 688 (1994).

In a number of important respects, the bankruptcy judge's findings were based upon William's testimony—testimony that was contradicted by Faigus. It is clear that the

---

**21.** The Court reminds the Trustee of the Seventh Circuit's admonishment that "[l]osers in a trial can go hunting for relief on appeal with a rifle or a shotgun. The rifle is better. As we have noted, the shotgun approach may hit the target with something but it runs the risk of obscuring significant issues by dilution." *Gagan v. American Cablevision, Inc.*, 77 F.3d 951, 955 (7th Cir.1996)

(citing *United States v. Levy*, 741 F.2d 915, 924 (7th Cir.), *cert. denied*, 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 366 (1984)). Even though this Court allowed the Trustee to file a brief in excess of fifty pages, a number of his arguments were underdeveloped due to the sheer number of issues raised on appeal.

bankruptcy court doubted the credibility of both witnesses, finding that they each had motives to color the truth. However, the court relied upon the fact that while William had been deposed seventeen times, his responses were both consistent and reliable. Conversely, Faigus's testimony changed critically over time, explaining only that his memory was better at trial.[22] Moreover, the bankruptcy court expressly relied upon the fact that William's testimony was supported by documentary evidence. A fair reading of the opinion reveals that the court might not have accepted William's statements in the absence of this corroborating documentation.[23] We cannot agree that the trial court erred.

■ Next, the Trustee asserts that the bankruptcy court committed clear error in valuating SMC at only $50,000, because the valuation was improperly based upon the court's conclusion that SMC was profitable only to William. In reaching this conclusion, the bankruptcy judge stated that:

> SMC had an even more serious problem than the risk of cancellation of the management agreements. As noted, Spatz & Co. agreed to manage the properties for SMC at a below market fee only because that arrangement allowed the Debtor to collect an additional cut. If the Debtor lost or sold his entire interest in SMC to a stranger, he would have had no reason to allow Spatz & Co. to continue that sweetheart arrangement, and SMC could not have replicated it. Undoubtedly, SMC would have had to find other, less advantageous means to do the work, reducing the

return to the subsequent owner, even if the management agreements were not canceled.

*Spatz*, 209 B.R. at 925.

The Trustee contends that "there is absolutely no credible support for the conclusion that 'SMC could not have replicated' its arrangements with Spatz & Co. .... Nothing in the record even hints at such a conclusion other than William's completely self-serving testimony." Trst. Br. at 43. To the contrary, there is ample evidence—independent of William's testimony—that Spatz & Co. agreed to perform services for SCM at a rate well below the market. William's testimony that he would not allow Spatz & Co. to continue providing services at a rate below the market if he were not receiving the profits from SCM is not self serving, it's common sense. In addition, Chudacoff testified that a purchaser would be able to rely only on one year's distributions from SMC because the management contracts were terminable at will and they were SMC's sole source of income.

The bankruptcy judge relied upon accepted valuation methods in reaching his conclusion, and properly accounted for the nature of SMC's arrangement with Spatz & Co. Therefore, we will not reverse the court's determination as clearly erroneous. However, we agree with the Trustee that if the bankruptcy court finds that William made the transfer with fraudulent intent, and Wendy cannot establish a defense under § 9, Wendy "must return the entire payment [s]he received." *Scholes*, 56 F.3d at 757.[24]

---

**22.** The Trustee characterizes the court's conclusion that Faigus was incredible as flawed because the court based its determination upon unreliable evidence. In addressing the factors relied upon by the bankruptcy court, the Trustee argues that Faigus' deposition and trial testimony weren't really inconsistent, and that the testimony that Faigus was preoccupied with other matters during the time Faigus claims he drafted the Exchange Agreement was unjustified and irrelevant. What the Trustee cannot argue away (although he tries) is the fact that while Faigus testified that the Exchange Agreement was not executed when he left Spatz & Co. in August, 1990, even the Trustee concedes that Wendy began receiving distributions from the Spatz & Co. stock transferred under the Exchange Agreement in May, 1990. The Trustee makes no attempt to

explain how Wendy could have been receiving the distributions in May if the transfer document was not executed in August.

**23.** Contrary to the Trustee's assertions, most of the testimony relied upon bankruptcy court was supported by documentary evidence. While the Trustee claims that this evidence was unreliable, the bankruptcy court did not err in finding otherwise.

**24.** The Trustee argues that the bankruptcy court erred by ignoring the distributions in valuing the stock. Under the § 550(a) of the Bankruptcy Code, the Trustee is entitled to recover property transferred with the intent to defraud, delay, or hinder creditors. 11 U.S.C. § 550(a). No one

Finally, the parties presented conflicting evidence as to whether 1) David transferred the $1.1 million to William in exchange for the purchase of the Neenah and Sioux Falls properties, or for some other purpose; and 2) whether the various agreements were back dated. The Trustee's evidence on these issues is not so compelling as to require us to reverse the bankruptcy court's findings of fact.

## CONCLUSION

It is apparent from a reading of the opinion that the bankruptcy court expended significant effort and took great care in reviewing both the evidence and the applicable law. In ruling that the defendants payment of full consideration was an absolute defense to fraud in fact, the bankruptcy court relied on language contained in the *Scholes* decision in a good faith attempt to predict how the Seventh Circuit would resolve the current dispute. While we, especially as a district court, hate to overturn a well reasoned decision of our esteemed colleague in the bankruptcy court, we conclude that the bankruptcy court's result conflicts with the plain language of the UFTA and requires reversal.

The Trustee's dispute with the bankruptcy court's evidentiary rulings and factual findings did not fare as well. While all of the issues were hotly disputed, as a reviewing court, we are not in a position to retry the case. All of the bankruptcy court's rulings were grounded in both fact and law, and will therefore be upheld. Finally, the Trustee has requested that we remand this case to a different bankruptcy court. We disagree that the facts of this case warrant such an action and decline to do so. We remain confident that the very capable and experienced bankruptcy court will conduct a fair hearing on remand which is fully consistent with this opinion. The bankruptcy court's

disputes this. Without citation to authority, however, the Trustee claims that "[s]imilarly, the value of that property must, of necessity, take into account the potential for such distribution." Trst. Brf. at 26. Contrary to the Trustee's assertion, the bankruptcy court fully acknowledged

opinion is affirmed in part, and reversed and remanded in part.

the value that the stock held for an insider. In determining its fair market value, however, the court properly recognized that a prudent investor would not purchase the stock based upon proceeds that were unlikely to continue.